Beatrice D. SAXION, et al.,
Plaintiffs–Appellees,

v.

TITAN-C-MANUFACTURING, INC.,
et al., Defendants–Appellants.

No. 94–3558.

United States Court of Appeals,
Sixth Circuit.

Argued July 27, 1995.

Decided June 7, 1996.

E. Bruce Hadden (briefed), Columbus, OH, Gregory W. Happ (briefed), Medina, OH, for Beatrice D. Saxion.

Edward G. Kemp, Paul L. Jackson (briefed), Roetzel & Andress, Akron, OH, for Titan-C-Manufacturing, Inc. and Titan-A-Manufacturing, Inc.

Before: ENGEL, NELSON, and SUHRHEINRICH, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The plaintiffs, former employees of defendant Titan-C Manufacturing, Inc., sued the company for closing its manufacturing facility without giving the 60 days notice required under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101 *et seq.* The district court found that Titan-C had violated the Act and had been in violation for a full 60 days.

In calculating statutory damages, the court multiplied each employee's regular daily rate of pay by a factor of 60. The court thus awarded "back pay," as it is called in the Act, for the total number of calendar days in what was found to be the violation period, including weekends and holidays for which the employees would have received no pay if the plant had remained open.

We shall affirm the judgment as to liability. Concluding that damages should be based on workdays rather than calendar days, however, and concluding further that the violation period was somewhat shorter than the district court held it was, we shall vacate the award and remand the case for a recalculation of damages.

I

Titan-C operated an assembly facility in Medina, Ohio, where it was alleged to have employed more than one hundred people. On March 2, 1990, plant superintendent John Sutton held a meeting to announce that the facility would be closing permanently. Mr. Sutton told the employees that they had the option of applying at a "Titan-S" facility in North Canton, Ohio, but that a position with Titan-S was not guaranteed. Mr. Sutton further indicated that the employees' wages, seniority, and benefits would decrease if Titan-S hired them. Titan-S is a separate corporate entity.

At an employee meeting held on March 13, 1990, Mr. Sutton passed out copies of a letter confirming the plant closing and offering employment with Titan-S at equal wages, benefits, and seniority. Mr. Sutton again stated orally that a position with Titan-S was not guaranteed, however.

On March 23, 1990, Titan-C closed its Medina facility permanently. Seventeen former Titan-C employees accepted the Titan-S offer and received jobs in North Canton with comparable terms of employment.

On May 8, 1990, fifty-one former Titan-C employees filed the present lawsuit against Titan-C under the WARN Act. A bench trial began on November 13, 1991. Believing that this trial was limited to the issue of liability, the plaintiffs rested without having presented evidence on damages. When it became evident that there was no agreement as to the scope of the hearing, the district court decided, over the objection of Titan-C, to bifurcate the case and conduct a damages hearing at a later date.

On March 25, 1992, the district court issued a decision in favor of the plaintiffs on the issue of liability. The court held that Titan-C was liable under the WARN Act because it had employed over one hundred workers at the relevant point in time and had failed to make a reasonable offer of transfer. A subsequent motion for relief from judgment under Rule 60(b), Fed.R.Civ.P., was denied.

The damages hearing took place on June 5, 1992. On August 31, 1992, the district court issued an order declaring that the plaintiffs were entitled to sixty calendar days' pay under the WARN Act and were entitled to attorney fees. The dollar amount of the

attorney fees was fixed at $58,957.73 by order of February 22, 1994, and a final judgment quantifying the damages awarded to each individual plaintiff was entered on April 22, 1994. This timely appeal followed.

## II

■ We first address Titan–C's assertion that the district court committed reversible error in denying a motion to dismiss the complaint when the plaintiffs rested at the initial bench trial without having shown the amount of their damages.

In the course of the arguments on the motion it became obvious that the parties had been proceeding under significantly different understandings as to the scope of the trial. The plaintiffs understood from the final pretrial order that the trial was limited to the issue of liability. The defendants insisted that damages were part of the plaintiffs' *prima facie* case under the WARN Act. Counsel for the plaintiffs stated that he had discussed with defense counsel the appointment of a special master to determine attorney fees and damages, and he said he had understood that this procedure would be followed. The defense countered that its understanding had been that the special master would only consider the issue of statutory fees.

The district court determined that there had been a genuine misunderstanding and that each attorney had communicated his own understanding of the scope of the trial to his clients. Finding itself unable to determine whose understanding was superior, the court "suggested" that the parties let the court determine the issue of liability. Titan–C argues that this decision to bifurcate the trial was reversible error.

■ We disagree. A district court may bifurcate a trial "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Rule 42(b), Fed.R.Civ.P. Only one of these criteria need be met to justify bifurcation. *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1177 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The language of Rule 42(b) places the decision to bifurcate within the discretion of the district court. *Davis v. Freels,* 583 F.2d 337, 343 (7th Cir.1978). The rule clearly suggests that a court may bifurcate a trial on its own motion. A decision ordering bifurcation is dependent on the facts and circumstances of each case. *Idzojtic v. Pennsylvania Rr. Co.,* 456 F.2d 1228 (3d Cir.1972).

Usually, of course, one of the parties will move for bifurcation before the start of trial. This is not a formal requirement, however, and nothing in the case law suggests that such a motion must necessarily be denied if it comes *in medias res.* Late motions for bifurcation are granted or (more often) denied based on a demonstration that bifurcation is, or is not, warranted under the circumstances of the particular case.

This includes decisions to bifurcate after trial is already under way. We have recognized that "separating the issues of liability and damages 'at the virtual close of plaintiff's proofs'" need not be an abuse of discretion. *Helminski v. Ayerst Laboratories,* 766 F.2d 208, 212 (6th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985). See also *Berry v. Deloney,* 28 F.3d 604, 606 (7th Cir.1994) (no abuse of discretion in denying a motion to bifurcate made after trial had begun, where limiting instruction would cure threat of undue prejudice).

The trial transcript in the case before us supports the district court's conclusion that the misunderstanding over the scope of the trial was genuine and that the plaintiffs' understanding that the initial hearing would be limited to liability was reasonable. The pretrial order on which the plaintiffs partly relied refers to the case as an "action for monies," but specifies only three "contested issues of fact;" none of these contested issues relates to damages. The transcript of the damages hearing indicates that there was no great overlap in issues. The defense called just two witnesses, only one of whom had testified earlier. Neither of the defense witnesses testified at length at the damages hearing. Under the highly unusual circumstances presented here, we are not persuaded that the district court abused its discre-

tion in separating the issues of liability and damages after the plaintiffs had rested.

## III

■ Titan-C also disputes the factual findings on the basis of which the district court concluded that Titan–C was liable under the WARN Act. These findings are subject to review under a "clearly erroneous" standard. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ Titan-C first argues that it was exempt from WARN Act liability because it employed fewer than one hundred people. "With some exceptions and conditions, WARN forbids an employer of 100 or more employees to 'order a plant closing ... until the end of a 60–day period after the employer serves written notice of such an order.'" *North Star Steel Co. v. Thomas,* —— U.S. ——, ——, 115 S.Ct. 1927, 1928, 132 L.Ed.2d 27 (1995) (quoting 29 U.S.C. § 2102(a)(1)). The number of employees is to be measured as of "the date the first notice is required to be given" unless, as may happen with cyclical businesses, this number is "clearly unrepresentative of the ordinary or average employment level." 20 C.F.R. § 639.5(a)(2). In such a case a more representative number may be used, but the governing regulation cautions that "[a]lternative methods cannot be used to evade the purposes of WARN and should be used only in unusual circumstances."

Arguing that it was a cyclical business, Titan–C presented a chart showing that over a one-year period the number of full-time employees had fluctuated from a low of 51 to a high of 117, with an average of 82. The district court discounted the reliability of the chart because the person who prepared it disclosed on cross-examination that she had not included employees on sick leave, vacation, suspension, or temporary layoff, and because Titan–C's records suggested that one of the low figures was understated by almost 50 percent. The plaintiffs presented evidence, based on payroll records and testimony from Titan–C's former bookkeeper and plant manager, that the company employed 121 employees on January 5, 1990, and 143

employees between January 23 and March 13. The court credited the plaintiffs' evidence.

Regulations subsequently promulgated by the Department of Labor support the district court's conclusion that workers on temporary layoff should be counted as employees. See 20 C.F.R. § 639.3(a)(1)(ii) and *Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1292, 1297 (E.D.Tenn.1990). We cannot say that the court's conclusion on this point was incorrect as a matter of law, and we are not persuaded that the court's findings of fact on the head-count issue were clearly erroneous.

■ Titan-C further contends that the liability issue ought to have been decided in its favor because it offered to transfer its employees to the Titan–S facility. There is no employment loss under the Act when (1) a plant closing "is the result of the relocation or consolidation of part or all of the employer's business" and (2) before laying off its employees the employer "offers to transfer the employee to a different site of employment within a reasonable commuting distance with no more than a six-month break in employment." 29 U.S.C. § 2101(b)(2)(A).

Relocation or consolidation occurs when "some definable business, whether customer orders, product lines, or operations, is transferred to a different site of employment and that transfer results in a plant closing or mass layoff." 20 C.F.R. § 639.3(f)(4). Titan–C concedes that there was no "consolidation" here in a legal sense, but it argues that there was a "relocation" of its business.

The record, as we read it, does not support Titan–C's argument. Nowhere in the stipulations of fact, the exhibits, or the oral testimony was it shown that any of Titan–C's business was being relocated to Titan–S in North Canton. The letter on which the company relies in this connection simply states that the employees would be "performing a similar job" at North Canton. The defense called only two witnesses at the initial hearing, a secretary and a transportation specialist, neither of whom addressed the relocation-of-business issue. The district court took notice of, but dismissed as conclusory, an affidavit by Titan–S's president stating

that "[a] decision was made to close Titan–C–Mfg., Inc. because of lack of work, a shutdown in production, and the opportunity of Titan–C–Mfg. to consolidate its operations with a separate corporation located in North Canton, Ohio." (The affidavit, submitted in support of a pretrial motion for summary judgment, was not received in evidence at trial.)

The statute, moreover, speaks in terms of a plant being closed as "the result" of a relocation of business. The statute does not provide an exemption where the plant is closed for other reasons. Evidence presented at the damages hearing, after the district court found Titan–C liable, indicated that the Medina plant was in fact closed because Titan–C lost a customer that had accounted for approximately 90 percent of its business.[1] As a result of the closure, according to Titan–C, the remaining 10 percent of Titan–C's business was transferred elsewhere. But under the plain language of § 2101(b)(2), as we read it, the section can only apply where the closure is the result of the transfer, not the other way around.

The district court went on to determine that the written offer to let employees transfer to the Titan–S facility in North Canton was not valid. The court credited trial testimony indicating that Titan–C "immediately rescinded" the offer and told the employees that they were not guaranteed positions at North Canton, that they would have to apply at Titan–S like everyone else, and that they would not receive comparable pay, seniority, or benefits. Whether the district court was correct is an issue we need not reach, Titan–C not having met the first requirement of § 2101(b)(2).

## IV

With respect to damages, the WARN Act provides that an employer which orders a plant closing without the required notice "shall be liable to each aggrieved employee who suffers an employment loss ... for ...

back pay for each day of violation at a rate of compensation not less than the higher of [*inter al.*] ... the final regular rate received by such employee...." 29 U.S.C. § 2104(a)(1)(A). The statute further provides that "[s]uch liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer." 29 U.S.C. § 2104(a)(1).

As noted above, the district court held that the company was liable to its aggrieved employees for "back pay" with respect to each calendar day in the violation period, including weekends and holidays. The court rejected Titan–C's contention that liability should be predicated on the number of workdays in the violation period.

Only two other circuits have squarely decided the workday versus calendar day issue. (The district court did not have the benefit of either decision at the time it made its ruling.) The Court of Appeals for the Third Circuit has taken the position that WARN Act liability extends to each and every day in the violation period, whether a workday or not. *United Steelworkers of America, AFL–CIO–CLC v. North Star Steel Co., Inc.*, 5 F.3d 39 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994). The Court of Appeals for the Fifth Circuit has explicitly rejected the Third Circuit position; "back pay," in the Fifth Circuit's view, is measured by the pay the employees would have received had the plant remained open throughout the violation period. *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores*, 15 F.3d 1275, 1283–86 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995).

In each of these conflicting decisions the court began its analysis, as is appropriate, with the language of the statute itself. While not taking issue with the proposition that "the use of the term 'back pay' in a traditional labor relations context generally connotes

---

1. Because this fact was never mentioned at the original hearing—indeed, Titan–C did not tell its own lawyer about the lost customer until months later—Titan–C cannot avail itself of the WARN Act's exception for "unforeseeable business circumstances." 29 U.S.C. § 2102(b)(1). And a litigant's carelessness or negligence does not constitute grounds for relief under Rule 60(b)(1), Fed.R.Civ.P.

a lost earnings concept," *North Star*, 5 F.3d at 42, the Third Circuit concluded that the use of the phrase "for each day of the violation," following the term "back pay," so clearly negated the lost earnings concept that the court was foreclosed from consulting the legislative history of the statute. *Id.* at 43. This conclusion made it unnecessary for the Third Circuit to come to grips with the key passage in the legislative history, where the Senate Labor Committee stated that damages for violations of the notice provisions of the Act "are to be measured by the wages ... the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period...." S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987).

To justify its holding that the language of the Act is sufficiently free of ambiguity to preclude resort to the legislative history, the Third Circuit invoked three familiar rules of statutory construction. We are not persuaded that any of these rules compels such a result.

The first of the rules in question is that "[c]ourts should avoid a construction of a statute that renders any provision superfluous." *North Star*, 5 F.3d at 42, quoting *Pennsylvania v. U.S. Dept. of Health and Human Servs.*, 928 F.2d 1378, 1385 (3d Cir. 1991). To read "back pay" as meaning lost earnings, the *North Star* court suggested, would be to render superfluous 29 U.S.C. § 2104(a)(2)(A), a provision stating that the amount of the employer's liability is to be reduced by "any wages paid by the employer to the employee for the period of the violation." There would be no need for Congress to prescribe such a reduction if "back pay" connoted lost earnings, the court reasoned; a lost earnings calculation would exclude such wages automatically.

But as the Fifth Circuit pointed out in *Dillard*, § 2104(a)(2)(A) could not apply where the employees had lost their jobs; "by definition," said the *Dillard* court, "an employee who has been terminated cannot earn any wages during the violation period." 15 F.3d at 1284 n. 14. The only situation in which § 2104(a)(2)(A) can apply is one where the aggrieved employee has suffered an "em-

ployment loss" of the sort defined by 29 U.S.C. § 2101(a)(6)(C)—"a reduction in hours of work of more than 50 percent during each month of any 6–month period." In that situation the aggrieved employee will still have wages, and these are the wages by which, § 2104(a)(2)(A) provides, the amount for which an employer is liable under § 2104(a)(1) shall be reduced.

It is true, we believe, that if § 2104(a)(2)(A) had been omitted from the statute, an employer that had wrongfully reduced its employees' hours of work by more than 50 percent could still have presented a strong argument that the amount of its statutory liability should exclude wages actually paid. Given the not inconsiderable complexities of § 2104(a)(1), however, it seems to us that Congress could reasonably have envisioned some risk that this argument might fail. By adding § 2104(a)(2)(A), Congress ensured that statutory damages could never duplicate wages already received. It is far from self-evident that in thus acting to protect the interests of WARN Act violators who reduced their employees' hours by more than 50 percent, Congress sabotaged the interests of other WARN Act violators—such as Titan–C—by manifesting an understanding that "back pay," as used in § 2104(a)(1)(A), does not mean what it normally means. We think that the proposition is sufficiently dubious, at least, to make it eminently sensible to consult the legislative history for whatever guidance might be found there.

The second rule of statutory construction cited by the Third Circuit is the rule that "a court should avoid an interpretation of a statute that would lead to absurd or unreasonable results." *North Star*, 5 F.3d at 42, quoting *Robert T. Winzinger, Inc. v. Management Recruiters, Inc.*, 841 F.2d 497, 500 (3d Cir.1988). It would be unreasonable to construe "back pay" as meaning lost earnings, the *North Star* court argued, and then to reduce the employer's statutory liability under § 2104(a)(2)(A) by earnings that had not in fact been lost. 5 F.3d at 42–43.

We agree that such a double credit would be unreasonable. But we do not agree that a conventional construction of the term "back

pay" in the case of an employer that has paid no wages for the period of the violation—an employer for which a double credit would thus be impossible—would be so manifestly unreasonable as to bar resort to legislative history that might explain what the drafters of the statute really had in mind.

As the *North Star* defendant argued, moreover, the interpretation which the Third Circuit was ultimately to adopt could itself produce anomalous results. If each aggrieved employee were entitled to damages in the amount of a normal day's pay multiplied by 60, a hypothetical part-time employee who worked just one ten-hour shift each Saturday would recover substantially higher damages than a full-time employee, paid at the same hourly rate, who worked eight hours per day, five days per week. Such a result would obviously be absurd.

Because the hypothetical part-time employee was not before the court, the Third Circuit did not find the hypothetical case a persuasive reason for consulting the legislative history. As pointed out above, however, no employee whose hours of work were reduced in the manner contemplated by § 2101(a)(6)(C) is before this court in the case at bar—and the hypothetical risk that the employer of such a person might argue for a double credit does not strike us as a persuasive reason for ignoring the legislative history.

The third rule of statutory construction advanced by the *North Star* court as a justification for declining to look at the legislative history is the rule that "a statute's provisions should be read to be consistent with one another, rather than the contrary." *North Star,* 5 F.3d at 43. To interpret "back pay" as meaning lost earnings, said the Third Circuit, would be to create a conflict between sections 2104(a)(1) and 2104(a)(2)(A) by allowing the employer "to reduce its liability by any earnings that the employees received during the period of the violation, even if those earnings were received from a different employer." *Id.*

The Fifth Circuit found this argument unpersuasive, and so do we. Acknowledging that the WARN Act contains no provision that would allow an employer to reduce its

statutory liability by the amount of its employees' outside earnings, the Fifth Circuit attached no significance to the absence of such a provision. The absence could plausibly be explained, said the court, by "the desire to avoid placing a burden on a terminated employee to mitigate damages by taking any job offered, the desire to give a terminated employee a window of time to readjust without immediately having to search for a job, [or] the desire for simplicity in the statutory scheme. . . ." *Dillard,* 15 F.3d at 1284 n. 14.

What we are left with, the *Dillard* court thought, is a statutory damages provision "susceptible to more than one reasonable interpretation. . . ." *Id.* at 1283. That is our view as well. It is true that the provision in question could plausibly be read as imposing a statutory penalty equal to an aggrieved employee's pay for a regular workday, calculated at the employee's regular hourly rate, multiplied by the number of calendar days in the violation period. We think it is at least as plausible, however, that the provision reflects an intention to provide statutory damages equal to the pay the employee would have received if he or she had remained on the job each workday throughout the violation period.

The pertinent Senate report makes it abundantly clear that the latter reading of the provision is the correct one. As quoted in *Dillard,* 15 F.3d at 1284–85, the report (S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987)) says that

"[f]or violations of the notice provisions, *damages are to be measured by the wages . . . the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period,* less any wages or fringe benefits received from the violating employer during that period. This is in effect a liquidated damages provisions [sic], designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings." (Emphasis by the court.)

The understanding reflected in the Senate report is consistent, as the *Dillard*

court noted at 15 F.3d at 1283–84, with the Supreme Court's understanding of what is meant by the term "back pay." See *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941), a National Labor Relations Act case where the Court used the term to mean "payment . . . of a sum equal to what [an employee] normally would have earned" absent a violation of the statute. Case law interpreting the National Labor Relations Act can be helpful in interpreting the WARN Act, see *United Mine Workers of America, AFL–CIO v. Peabody Coal Co.*, 38 F.3d 850, 853 (6th Cir. 1994), and so it is here. "Back pay" has a well-established meaning, and the interpretation adopted by the *North Star* court has "essentially written the term out of the statute." *Dillard*, 15 F.3d at 1283–84 n. 14.

The bankruptcy courts, finally, have consistently held that where a WARN Act violator seeks bankruptcy protection, the statutory liability for "back pay" is a liability for wages; WARN Act claims for back pay are given priority accordingly. See, *e.g.*, *In re Hanlin Group, Inc.*, 176 B.R. 329, 333 (Bkrtcy.D.N.J.1995), and *In re Riker Industries, Inc.*, 151 B.R. 823, 827 (Bkrtcy. N.D.Ohio 1993). The understanding of the WARN Act reflected in these cases corresponds to that articulated in the legislative history and adopted by the Fifth Circuit in *Dillard*.

The *Dillard* decision held that "damages in lieu of the WARN Act notice are to be calculated using . . . the number of work days within the violation period." 15 F.3d at 1286. We adopt that holding here.

### V

▮▮▮▮ Titan-C argues that it should not have been found in violation of the WARN Act for the full sixty days. The company, it will be recalled, notified its employees in writing on March 13 that the Medina facility was going to be closed. The facility was then closed ten days later. The district court held that because the March 13 notice did not comply with certain technical requirements set forth in 20 C.F.R. § 639.7, there was no shortening of the violation period. But "neither the Act nor the regulations suggest that defective notice is automatically to be treated as though no notice had been provided at all." *Dillard*, 15 F.3d at 1287 n. 19. We are not persuaded that the technical deficiencies in the March 13 letter required the district court to proceed as if there had been no notice at all.

The March 13 letter indicated that the closing would be permanent and would affect the entire plant. The letter gave the name and telephone number of a company official who could be contacted for questions. That the notice was deficient in other respects does not change the fact that ten days before the plant was closed, the affected employees clearly knew that it was going to be closed. In calculating damages, therefore, the district court should have used a violation period of 50 days, not 60.

▮▮▮▮ Titan-C also maintains that the district court should have reduced its liability under 29 U.S.C. § 2104(a)(4) because it made a good faith attempt to comply with the statute.[2] "Any assessment of an employer's good faith or grounds for its belief in the legal propriety of its conduct is necessarily a finding of fact, to be disturbed on appeal only if clearly erroneous." *Dillard*, 15 F.3d at 1287.

▮▮▮▮ The district court accepted the proposition that Titan–C acted in subjective good faith. The court found, however, that the company's conduct was not objectively reasonable. An employer must show objective good faith to qualify for a reduction in damages under the WARN Act. *Oil, Chemical & Atomic Workers Int'l Union, Local 7–515, AFL–CIO v. American Home Products Corp.*, 790 F.Supp. 1441, 1452 (N.D.Ind.1992).

Among other factors, the district court noted in the case at bar, it was unreasonable to

---

2. Section 2104(a)(4) provides as follows:
    "If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section."

assume that employees on temporary leave, sick leave, or vacation would not suffer an employment loss when the plant closed. This finding is not clearly erroneous. Even where good faith is manifest, moreover, the decision to reduce the amount of damages is within the discretion of the district court. Nothing suggests to us that the district court abused that discretion in the present case.

For the foregoing reasons, we **AFFIRM** the disposition with respect to liability, **VACATE** the award of damages, and **REMAND** the case to the district court for the award of damages in amounts not inconsistent with this opinion.