# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2892

RONALD CASTRO, LAURETTA GRANT, CHERMI JONES,
WILLIE MIRANDA, VICTOR CASTILLO, GARRICK
WHITEHEAD, KENNETH AGEYEMAN, M. JEROME
ROCHELLE, ORLANDO MORRIS, MARCUS MILES,
SHINETTA JOHNSON, VICTOR BROWN, SONIA JONES,
ALLEN MCCULLOUGH, KIM DAVIS, GRANT OGBURN,
and CUPID STEWART, individually and on behalf of
a class of persons similarly situated,

*Plaintiffs-Appellees*,

*v.*

CHICAGO HOUSING AUTHORITY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6910—**Joan Humphrey Lefkow**, *Judge.*

_____

ARGUED JANUARY 15, 2004—DECIDED MARCH 10, 2004

_____

Before COFFEY, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* For 10 years, the Chicago Housing
Authority (CHA) operated its own police department,
providing police services to residents of its housing develop-

ments. On October 12, 1999, however, the CHA notified its employees that it was closing the department. Two and a half weeks later, on October 29, 1999, the CHA laid off its police officers and security personnel. Seventeen ter minated employees filed a class action lawsuit[1] under the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2101 *et seq.*, arguing that the CHA failed to give its employees 60 days notice before termination, as the law requires. District Judge Joan Humphrey Lefkow denied the CHA's motion for summary judgment, rejecting its argument that the CHA was not a covered employer for purposes of the Act. After a 2-day bench trial, the court awarded the employees some $1.2 million in damages. 2003 WL 21518321 (N.D. Ill. July 1, 2003). The CHA appeals, presenting this court with an issue of first impres-sion: whether a municipal corporation, or quasi-public body, like the CHA is subject to the WARN Act.[2] The CHA also

---

[1] Plaintiffs represent a class of "all sworn officers and security officers employed by the CHA Police Department who were ter-minated as a result of the closing of the Chicago Housing Author-ity Police Department." There are 274 class members, including 5 commanders, 2 coordinators, 11 sergeants, 241 patrol officers, and 15 security officers.

[2] Housing authorities "are generally held to be quasi-municipal corporations rather than municipal corporations, in the strict sense of the term." 1 *McQuillin, The Law of Municipal Corporations* § 2.29.20 (3d ed. rev. 1999). *See, e.g., Williams v. Hanover Housing Auth.*, 113 F.3d 1294, 1295 (1st Cir. 1997) ("The Authorities are quasi-public entities . . . ."). Because the proper classification of the CHA is not necessary for our purposes, however, we will use the terms "municipal corporation" and "quasi-public" entity interchangeably. Both terms, significantly, are to be considered distinct from traditional municipal corpora-tions, such as cities, that are "created for political purposes only,

(continued...)

argues that Judge Lefkow erred in fail-ing to reduce the damage award due to its good faith effort to comply with the Act and the severance pay it provided to the terminated employees. Finally, the CHA contends that the judge erred in denying its motion for leave to file an affirmative defense—that the employees waived their right to bring this lawsuit in a settlement agreement signed between their unions and the CHA.

The CHA is a municipal corporation organized under the Illinois Housing Authorities Act, 310 ILCS 10/1 *et seq.* Its purpose is to provide low-rent housing and rental as-sistance in the city of Chicago. *Id.* at 10/2.2. A Board of Commissioners appointed by the mayor of Chicago and confirmed by the City Council administers the CHA. The United States Department of Housing and Urban Development (HUD) is the CHA's primary source of fund-ing. During 1998 and 1999, for example, federal grants and subsidies made up over 80 percent of the CHA's income. Rent and other sources of income, such as local and state grants and subsidies, made up the remaining 20 percent. HUD's funding is made through an "annual contributions contract" (ACC) entered into between HUD and the CHA which sets forth terms and conditions under which the CHA is allowed to spend HUD funds.

In 1989, with legislative authorization (*see* An Act Relating to Housing Authorities, No. 86-457 (codified at 310 ILCS 10/8.1a)), the CHA established its own police de-partment. Police personnel subsequently came to be rep-resented by three unions. The Captains, Lieutenants and Sergeants Coalition, affiliated with Local 73, Service

---

(...continued)
with political powers to be exercised for purposes connected with the public good in the administration of civil government . . . ." *McQuillin* at § 2.03.

Employees International Union (the Coalition), represented police supervisors. Police officers were represented by the Illinois Fraternal Order of Police Labor Council (FOP). Finally, the Service Employees International Union (SEIU) represented security officers. The CHA and these three unions were parties to collective bargaining agreements.

In June 1995, HUD declared a breach of the ACC and assumed control of the CHA. Relevant here, HUD found that the CHA was spending an "exorbitant amount" of funds on "very inefficient" security. As a result of the take-over, from June 1995 to May 1999 a HUD appointee, called a "chairperson," administered the CHA. The chairperson was responsible for policymaking, approving contracts, and all other functions that were normally within the power of the CHA's Board of Commissioners. Day-to-day operations, however, remained with CHA officials. Joseph Shuldiner, CHA executive director from October 1995 to June 1999, testified that the CHA had the authority to determine how best to manage certain property, as long as HUD standards were met. Shuldiner also stated that the CHA generally handled the hiring and firing of its police officers as long as the CHA acted within HUD's funding constraints. Matthew Brandon, CHA police department deputy chief prior to July 1996, CHA police department acting first deputy from July 1996 through November 1996, and CHA police department acting chief from November 1996 through December 1996, confirmed that the CHA handled day-to-day operations. He stated, for example, that he "had independent authority to manage the CHA police department budget within the parameters allowed by HUD."

In October 1996, HUD issued a corrective action order (CAO) which required the CHA to reduce spending on security and police by at least $25 million during the 2-year period of fiscal years 1997 and 1998. If the CHA failed to abide by the CAO, HUD could have withheld some or all of the CHA's general grant program funds. To comply, the

CHA laid off 69 of its 394 police officers in 1998, layoffs which were the subject of another lawsuit, *see Rowen v. Chicago Housing Auth.*, 149 F. Supp. 2d 390, 393 (N.D. Ill. 2001) (concluding that the CHA did not conduct a "mass layoff" within the meaning of the WARN Act because the layoffs only affected some 17 percent of employees, less than the 33 percent the Act requires). HUD returned control of the CHA in May 1999.

A year after the initial layoffs, the CHA determined that it was necessary to close the entire police department. On September 7, 1999, Director of Labor Relations Kevin Krug met with representatives of the Trade Coalition, a union which represented CHA trade employees, including electricians, plumbers, plasterers, carpenters, and bricklayers. At that meeting Krug advised the union of upcoming layoffs. During negotiations, the union mentioned CHA's need to comply with the WARN Act.

As a result of that meeting, Krug asked Joseph Moriarty, the CHA's senior staff counsel, to determine if the WARN Act covered the CHA. In response, Moriarty testified, he reviewed annotated versions of the WARN Act, relevant case law, and accompanying regulations promulgated by the United States Department of Labor (DOL). Moriarty concluded that the CHA was not subject to the WARN Act because it was not an "employer" as defined by the DOL. Moriarty testified that he communicated this conclusion to CHA officials, including Krug, but not to the CHA Board or its chairperson, Sharon Gist Gilliam. Nor did he write anything down or maintain any files. Krug, who is not an attorney, also reviewed the applicability of the WARN Act. He obtained an internet publication entitled "WARN Act Guide to Advance Notice of Closings & Layoffs." That document stated that "[p]rivate, for-profit employers and private, nonprofit employers are covered, as are public and quasi-public entities which operate in a commercial context and are separately organized from the regular gov-

ernment. Regular Federal, State, and local government entities which provide public services are not covered." Krug, like Moriarty, concluded that the WARN Act did not apply to the CHA.

The CHA, on September 23, 1999, sent a memorandum to Coalition members, pursuant to the collective bargaining agreement, stating that it was contemplating closing the police department. As for the other employees, it made the memorandum available by putting a copy in the command order book. Several weeks later, on October 12, the CHA sent a memorandum to all its employees stating that "the Chicago Housing Authority has decided that it will no longer operate it's [sic] own police department." It notified the unions that the employees would be officially terminated on October 29, 1999.

On October 18, 1999, Acting Chief Harvey Radney distributed a memorandum informing the department's personnel that all officers affected by the layoff were being placed on administrative leave beginning October 19, 1999 (a few personnel were retained for administrative purposes for a short transition after October 29). The officers placed on administrative leave were paid through October 29, 1999, and provided health and dental insurance benefits through December 31, 1999. After negotiations, the CHA signed settlement and severance agreements with the three relevant unions. Among other provisions, the unions waived any past and future legal action. The total severance pay totaled $516,000. The CHA provided a variety of job counseling and one-on-one outplacement services to the police and security personnel who lost their jobs. It paid $5,000 for each officer who participated in the counseling. These services were provided until May 2000, 7 months after the police department closed. On November 1, 1999, the CHA conducted a job fair where at least 170 personnel received a job search manual and information about positions at other police departments. The CHA also opened two career centers.

Approximately one week before being terminated, on October 21, 1999, the affected employees filed this suit under the WARN Act, arguing that they were entitled to 60 days notice before being laid off. Today we resolve the CHA's appeal of the loss it suffered in the district court.

At the outset, we must determine whether the WARN Act applies to quasi-public entities like the CHA. While a question of first impression,[3] the DOL has aided us in our task. In implementing regulations under the Act, the DOL noted:

> Because of the use of the term "business enterprise", DOL concludes that regular Federal, State, and local government public agencies and services are outside the purview of WARN. . . . The legislative history is not helpful on the specific question of coverage of public and quasi-public business enterprises. DOL agrees that the underlying intent of WARN is worker protection. Given the nature and the language of the law, DOL concludes that the term "business enterprise" used in the statute includes public and quasi-public entities which engage in business (i.e., take part in a commercial or industrial enterprise; supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments). Whether a particular public or quasi-public

---

[3] Only one other court has reviewed the WARN Act in the public sector. That case, however, is not helpful. In *Schmelzer v. Office of Compliance*, 155 F.3d 1364 (Fed. Cir. 1998), the Federal Circuit held that the House Postal Operations, a division of the Office of the Chief Administrative Officer of the U.S. House of Representatives, was subject to the Act. In that case, the Congressional Accountability Act of 1995, 2 U.S.C. § 1315, adopted the WARN Act and therefore made it applicable to the legislative branch. *Id.* at 1367. The court concluded, however, that the plaintiffs' rights were not violated. *Id.* at 1370.

> entity is covered will be determined by the functional test described above and by an organizational test, i.e., whether the entity is managed by a separately organized governing body with independent authority to manage its personnel and assets. . . . The test that has been adopted is intended to be a relatively precise one that will include such entities as regional transportation authorities and independent municipal utilities, but will exclude such organizations as school boards.

54 Fed. Reg. at 16044 (April 20, 1989).

Consistent with the above analysis, the DOL issued the following regulation, defining a covered "employer" as including

> public and quasi-public entities which engage in business (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments), and which are separately organized from the regular government, which have their own governing bodies and which have independent authority to manage their personnel and assets.

20 C.F.R. § 639.3.

CHA argues first that the DOL regulation is an impermissible construction of the statute. In the alternative, it contends that if the regulation is valid, the CHA is not covered by the DOL's definition of an employer. We will address each of these arguments in turn.

In assessing the CHA's claim that the DOL regulation is invalid, we are guided by the familiar *Chevron* doctrine. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), requires us to engage in a two-step inquiry. At step one, we inquire whether Congress "has directly spoken to the precise question at issue," in which case we

"must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If the statute is silent or ambiguous on the issue, we will defer at step two to any reasonable agency interpretation. *Id.* at 843.

Examining the text of the statute, we agree with the district court that the statute is ambiguous with respect to whether entities like the CHA are covered. The Act defines "employer" as "any business enterprise that employs" a requisite number of employees. 29 U.S.C. § 2101(a)(1). The Act does not, however, define "business enterprise." Legislative history is also unhelpful. The House Conference Report states that the "[c]onferees intend that a 'business enterprise' be deemed synonymous with the terms company, firm or business . . . ." H.R. Rep. No. 100-156, at 1046 (1988), *reprinted in* 1988 U.S.C.A.A.N. 2078, 2079. Both sides concede, and the DOL regulation emphasizes, that since the definition speaks in terms of the business character of an entity, the Act does not cover traditional governmental units such as, for example, the city of Chicago. Municipal corporations like the CHA, however, while formed for a public purpose, also engage in commercial activities that characterize traditional businesses. Indeed, as the name itself suggests, a municipal *corporation* "has a dual character, the one public and the other private . . . ." *Black's Law Dictionary* 1017 (6th ed. 1990). The CHA, for example, rents, leases, purchases, and sells property like any other real estate owner, 310 ILCS 10/8.3. It has, moreover, the authority to borrow money and make investments, *id.* at 10/8.4, and enter into contracts, *id.* at 10/8.5, all functions traditional private businesses perform. Thus, there is no reason to conclude that the term "business enterprise" necessarily excludes quasi-public entities. Indeed, there is simply no evidence that Congress even considered where municipal corporations fit in its regulatory scheme, let alone spoke precisely to the issue. *Cf. Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93-94

(2002) (striking down regulation which had effect of giving plaintiff more than 12 weeks of leave because it "amends the FMLA's most fundamental substantive guarantee—the employee's entitlement to 'a total of 12 workweeks of leave during any 12-month period'"); *Sierra Club v. EPA*, 311 F.3d 853, 858 (7th Cir. 2002) ("The most obvious problem with the EPA's approach is that Congress has already spoken to the precise question of extensions under the CAA by enacting an extension provision that looks nothing like the agency's Extension Policy."); *Diersen v. Chicago Car Exch.*, 110 F.3d 481, 486 (7th Cir. 1997) (regulation exempting older cars from the requirements of the Vehicle Information and Cost Savings Act (Odometer Act) was invalid where express language of the statute contained no exceptions).

Although there is no evidence, from either the statute itself or legislative history, of Congress's intent on the issue, the CHA argues that we should infer from Congress's silence that it did not intend to cover quasi-public entities. In support of this position, the CHA contends that when Congress means to cover public sector employees, it knows how to do so. *See, e.g.*, Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(d),(x) (defining "employer" to include "a public agency" which is defined as "the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States . . . , a State, or a political subdivision of a State; or any interstate governmental agency"); Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(a) (extending Act to state and local governments); Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 630(b) (same); Americans with Disabilities Act (ADA), 42 U.S.C. § 12111(7) (expressly applying the Act to public employers); Family and Medical Leave Act (FMLA), 29 U.S.C. § 2611(4)(A)(iii) (applying the Act to government entities). While true, we also note that when Congress specifically intends to exclude governmental entities, it also

knows how to do so. *See, e.g.*, National Labor Relations Act, 29 U.S.C. § 152 (defining "employer" as specifically "not includ[ing] the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof . . . ."). Thus, all we can deem from congressional silence on the issue is just that—that Congress was silent on the issue. As we recently noted, "inferences from congressional silence are treacherous; oversights are common in the hurly-burly of congressional enactment; omissions are not enactments; and even deliberate omissions are often subject to alternative interpretations . . . ." *Alto Dairy v. Veneman*, 336 F.3d 560, 566 (7th Cir. 2003). *See also Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("congressional silence 'lacks persuasive significance' ") (internal citation omitted).

Having found Congress silent as to whether the Act covers quasi-public entities like the CHA, we proceed to the second *Chevron* step, whether the DOL's interpretation of the statute is reasonable. We note that we must defer to the DOL's interpretation so long as it is "a permissible construction of the statute." *Chevron*, 467 U.S. at 843. We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. Applying this standard, the DOL's interpretation of "business enterprise" is entirely reasonable. As we have noted, quasi-public entities like the CHA have many characteristics of traditional businesses. For this reason, the DOL's decision to include these entities in the definition of a covered "employer" is a permissible construction of the statute.

Concluding that the DOL regulation is valid, we turn to whether the CHA is an "employer" under 20 C.F.R. § 639.3. The DOL emphasizes several factors in determining if a quasi-public entity is a "business enterprise" for

purposes of the Act: (1) does it engage in business (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments); and (2) is it separately organized from the regular government, having its own governing bodies and independent authority to manage its personnel and assets? It is inescapable, examining these factors, that the CHA is a covered "employer." First, the CHA engages in business. It rents, leases, purchases, and sells real estate. Furthermore, it independently manages public assets, raises its own revenue, and makes investments. *See* 310 ILCS 10/8.4 (power to borrow and invest); 310 ILCS 10/11 (power to issue bonds and obtain loans). Although public funds are a significant percentage of its operating budget, most quasi-public entities, including those the DOL specifically mentions as being covered, like regional transportation authorities and independent municipal utilities, *see* 54 Fed. Reg. 16044, are subsidized by taxpayers. There is, moreover, no question that it is separate from the city of Chicago. It is not a department of the city, it has its own governing commission and commissioners, and it has independent authority to manage its personnel. Significantly, even when the CHA was placed under HUD control (control which, noticeably, reverted back to the CHA over 60 days prior to the layoffs), day-to-day operations remained with CHA officials. Joseph Shuldiner testified that the CHA had the authority to determine how best to manage certain property and handle personnel decisions. Matthew Brandon confirmed Shuldiner's description that the CHA handled day-to-day operations. He stated that he "had independent authority to manage the CHA police department budget within the parameters allowed by HUD." Considering these facts, the CHA falls squarely within the DOL's definition of a covered employer under the WARN Act.

Once the CHA is deemed an "employer," it is undisputed that it violated the Act—it did not give its employees 60 days notice before they lost their jobs. The WARN Act provides that an employer found liable must pay each aggrieved worker back pay for each day of violation and certain benefits under an employee benefit plan. 29 U.S.C. § 2104(a)(1). The district court set those damages at $1,268,087.60. (For a detailed description of the calculations, *see* 2003 WL 21518321 (N.D. Ill. July 1, 2003)). The CHA contends, however, that the court erred in failing to reduce the damages due to CHA's good faith effort to comply with the statute and as a result of certain wages and severance payments received by the discharged workers. We address these affirmative defenses in order.

First, the CHA argues that it entertained a "good faith" and reasonable belief that it was not covered by the Act. Thus, the district court should have reduced its liability pursuant to 29 U.S.C. § 2104(a)(4), which provides:

> If an employer which has violated [the] Act proves to the satisfaction of the court that the act or omission that violated [the] Act was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the] Act the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

The good faith defense requires proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act. *See, e.g., Saxion v. Titan-C-Manufacturing, Inc.*, 86 F.3d 553, 561-62 (6th Cir. 1996); *Frymire v. Ampex Corp.*, 61 F.3d 757, 767-68 (10th Cir. 1995). As the employer, the CHA bears the burden of proof as to this mitigation defense. Moreover, this defense must be narrowly construed. *See Bankston v. State of Ill.*, 60 F.3d 1249, 1254 (7th Cir. 1995) (An employer seeking to avoid

imposition of liquidated damages under the FLSA "bears a *substantial burden* in showing that it acted reasonably and in good faith.") (internal citation omitted) (emphasis added).[4] As the Act commands, we review the district court's decision not to reduce damages under an abuse of discretion standard. *Saxion*, 86 F.3d at 562 ("even where good faith is manifest, moreover, the decision to reduce the amount of damages is within the discretion of the district court"); *Lee v. Coahama County*, 937 F.2d 220, 227 (5th Cir. 1991) (under FLSA, "even if the district court determines that the employer's actions were in good faith and based on reasonable grounds, the court has discretion to award liquidated damages"). Applying this standard, we cannot say that the district court abused its discretion.

The CHA's good faith argument is based largely on Moriarty's efforts to determine whether the CHA was

---

[4] Section 2104(a)(4) emerged from section 334(a)(5) of S. 538, the Senate bill which was ultimately included in H.R. 3 and vetoed by President Reagan. The language of section 334(a)(5) was identical in all relevant aspects to the language eventually adopted in the WARN Act. Richard W. McHugh, "Fair Warning or Foul? An Analysis of the Worker Adjustment and Retraining Notification (WARN) Act in Practice." 14 Berkeley J. Emp. & Lab. L. 1, 51 (1993). The Committee report, in discussing section 334(a)(5), states that it was modeled on and should be interpreted in accordance with the case law under § 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, which amended the FLSA. S. Rep. No. 62, 100th Cong. 1st Sess. at 24-25 (1987). That statute reads: "[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938 . . . the court may, in its sound discretion, award no liquidated damages or award any amount thereof . . . ." 29 U.S.C. § 260. Based on this, we rely on case law under the Portal-to-Portal Act in interpreting the good faith reduction under the WARN Act.

a covered entity under the Act. *See Frymire*, 61 F.3d at 768 (evidence that the employer subjectively intended to comply with the Act "can include proof that the employer worked with legal counsel to determine whether the company was in compliance with WARN, as well as more general evidence that the company had its employees' welfare in mind"). Significantly, however, the issue of the WARN Act was only brought up by an opposing union representative. As Judge Lefkow keenly observed, "the WARN Act was nothing but an afterthought to the CHA with respect to all of the terminations it was planning." At least with the trade unions, the CHA was already bargaining over the effects of termination before it considered the WARN Act. The natural inference is that this was the case with the police, too. Moriarty, moreover, did not share his opinion with the CHA Board or its chairperson. While he was not required to, the seriousness of the CHA's efforts to comply with the Act is suspect where the ultimate decisionmakers showed no interest in the conclusions of their legal counsel. Finally, deference is due the trial court, which could weigh Moriarty's testimony and credibility with respect to the comprehensiveness of his efforts. Without the production of one scintilla of physical evidence, since Moriarty maintained and produced no papers, no memoranda, and no files related to his research, we have no way to determine whether he conducted extensive research into the issue or merely made a cursory glance at the statutes and case law. *Compare General Elec. Co. v. Porter*, 208 F.2d 805, 816 (9th Cir. 1953) (attorneys "studied for a long period of time the question whether the Act was applicable to these firemen. After extensive research and numerous conferences, the attorneys for General Electric rendered an opinion that the firemen were excluded from the coverage of the Act."), *with Washington v. Aircap Indus., Inc.*, 860 F. Supp. 307, 318 (D.S.C. 1994) ("To hold that Aircap acted in good faith by obtaining an 'off the cuff' oral opinion [from

counsel] that directly affected the lives of 257 long term employees would eviscerate the purpose of the WARN Act.").

The CHA next argues that the damage award should have been reduced by 13 days of back pay because of the notice it sent out on September 23, 1999. *Frymire*, 61 F.3d at 769 (in considering good faith reduction, noting that "while Ampex did violate WARN's sixty-day notice requirement, the company had provided all of its employees, months in advance, more generalized notice that major layoffs were imminent"). Judge Lefkow rejected this defense on the ground that the notice was not sent to all of the officers, but only to members of the Coalition. Also, she held that since the collective bargaining agreement with the Coalition required the CHA to notify it that it was contemplating closing the department, it defeats the CHA's good faith defense. We agree.

The good faith reduction is intended for circumstances where the employer technically violates the law but shows that it did everything possible to ensure that its employees received sufficient notice that they would be laid off. *See, e.g., Saxion*, 86 F.3d at 561 ("[N]either the Act nor the regulations suggest that defective notice is automatically to be treated as though no notice had been provided at all."); *Carpenters Dist. Council v. Dillard Dept. Stores*, 15 F.3d 1275, 1287 n.19 (5th Cir. 1994) (same). Here, however, the evidence presented to the trial court does not establish that CHA did everything possible to "eas[e] the personal and financial difficulties for [its] workers . . . .", S. Rep. No. 100-62 at 3, by giving advance notice to ensure that its officers and their families had adequate time to plan for the day they were out of a job, especially a job that would seem to be rather impervious to an economic downturn. The evidence here, which Judge Lefkow was certainly free to credit, was that the CHA only did what it was minimally required to do. Krug admitted at trial that while the

memorandum was addressed to "all personnel," it was only sent to Coalition members, which the CHA was required to do under its collective bargaining agreement, and that no similar document was sent to the regular police and security officers. While the memorandum was placed in the command order book, ostensibly where all employees could view it, had the CHA truly intended to give a wide notice to the employees who were going to be out of work it could have done it with ease. A simple mailing would have done the trick. Furthermore, the memorandum merely notified employees that the CHA was "contemplating" closing the department. This is not the type of information that would allow employees and their families to make necessary plans and arrangements.

A comparison with cases in which courts did find a good faith effort to comply is warranted. In *Oil, Chemical and Atomic Workers International Union v. American Home Products Corp.*, 790 F. Supp. 1441, 1452-53 (N.D. Ind. 1992), although the employer technically violated the Act, the court permitted a good faith reduction where the employer gave notice in November that the plant would be completely shut down by the last quarter of the following year. The notice included a tentative schedule identifying the quarter in which the employer expected to terminate each job grouping. In *UAW Local 1077 v. Shadyside Stamping Corp.*, 1991 WL 340191 (S.D. Ohio 1991), *aff'd without opinion*, 947 F.2d 946 (6th Cir. 1991), the employer advised the union in writing in late September 1988 that it expected layoffs from February 1, 1989, to April 30, 1989, due to the cancellation of a large contract. A second letter to the union in early January 1989 confirmed the layoffs would take place as previously advised. On February 3, 1989, 31 employees were laid off, and on February 27 another 15 employees were laid off. A third letter to the union on March 15 warned of more layoffs on April 3. On that date, 66 employees were laid off. On April 10, the employer

provided advance notice of another layoff of 50 employees to take place on June 9. Reviewing this evidence, the court concluded that, while the employer technically violated the Act, "there can be no question that the employer proceeded in good faith in its attempt to properly notify the employees of future layoffs." *Id.* at *9. The same cannot be said here.

Finally, the CHA contends that it demonstrated its subjective intent to comply with the Act through its efforts to help police and security personnel find new employment. It points out that it hired Challenger, Gray and Christmas, an outplacement consulting firm, to conduct a job fair, it maintained two career centers, and it provided one-on-one job counseling. The CHA also provided health benefits for 60 days beyond the date the department ceased operating. Moreover, it paid unemployment compensation, and it settled all the disputes it had with the three unions representing the class members and provided over $2 million to former police and security officers as a result of that settlement. All of these payments, however, were provided to the employees after the WARN Act violation. As one court emphasized, "the defendant's conduct *after* the violation is not relevant to the determination of good faith contemplated by the statute. The pertinent inquiry in deciding whether to exercise the court's discretion in favor of reducing the defendant's liability is the defendant's conduct *prior* to the notice[.]" *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1291 (E.D. Tenn. 1990). Furthermore, with respect to the unemployment compensation, the CHA was required to make these payments under Illinois law. With regard to the $2 million it provided as part of settlement agreements, the CHA received something very substantial in return, the settlement of all pending labor disputes. Following state law and settling potential lawsuits hardly evidences one's good faith effort to ease the employees' burden.

Considering all of these facts and arguments, we cannot say that Judge Lefkow abused her discretion in not reducing damages under § 2104(a)(4). And, because we agree that the CHA did not meet its substantial burden in establishing that it subjectively intended to comply with the Act, we need not determine whether the CHA's belief that it was not covered by the Act was objectively reasonable.

Having concluded that the CHA was not entitled to a reduction in damages under § 2104(a)(4), we turn our attention to § 2104(a)(2), which allows an employer to reduce its liability by "any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." 29 U.S.C. § 2104(a)(2)(B). The CHA argues it was entitled to a reduction of damages due to severance payments it provided class members, an amount that totaled $516,000. Because the severance pay was intimately tied to settlement agreements in which the unions agreed to drop all pending lawsuits, we again agree with Judge Lefkow that the payments were not voluntary and unconditional and that they are thus not deductible.

Both under the Illinois Public Labor Relations Act, (IPLRA), 5 ILCS 315/1 *et seq.*, and the collective bargaining agreements with the three unions, the CHA was required to bargain over the impact of the decision to close the department.[5] Out of those negotiations, the CHA signed five

---

[5] IPLRA requires parties "to negotiate in good faith with respect to wages, hours, and other conditions of employment . . . but such obligation does not compel either party to agree to a proposal or require the making of a concession." 5 ILCS 315/7. The collective bargaining agreement with the captains' Coalition (Art. 24) said that "[i]n the event the CHAPD is merged or terminated, the Authority will meet with the Union prior to making a final decision for the purpose of discussing the decision and any feasible alternatives." The agreement with FOP (Art. 11) said that "[i]n

(continued...)

documents with the three unions representing its officers; both the FOP and Coalition signed separate settlement and severance agreements with the CHA and there was a combined agreement between the CHA and the security officers' union. The settlement agreements consisted of resolving the various arbitration and union complaints that were filed with the CHA. The agreements also settled all pending labor charges.

At both trial and on appeal, the CHA attempts to disconnect the severance pay and settlement agreements. Krug, for example, testified that the parties intended the agreements to be separate and that the severance package was generously given to the officers out of a desire to "lessen the impact" of the loss of jobs. In contrast, however, Brandon testified that "[o]ne would not have been signed without the other." He testified that the agreements were negotiated at the same time and that they were part and parcel of one agreement. The evidence overwhelmingly supports Brandon's observation.

At a minimum, it is hard for the CHA to argue that the severance package with the security officers' union was not connected to the settlement agreement since they are part of the same document. Moreover, examining the settlement

---

(...continued)

the event the Authority intends to lay-off a majority of the bargaining unit or eliminate the Police Department, the Labor Council reserves the right to impact and effects bargain upon written notice to the Authority within fifteen (15) days of the labor Council's receipt of such notice." The agreement with the security officers union (Art. 5, ¶ J) read: "In the event the Authority decides to discontinue the management of any operation or function, it shall provide the Union with at least thirty (30) calendar days' prior notice and shall, upon request, negotiate with the Union over the effects, if any, on members of the bargaining unit if such decision will directly result in the permanent layoff of any bargaining unit members[.]"

and severance agreements between the Coalition and CHA, the indisputable inference is that they are connected. First, the agreements refer to each other. The severance agreement states that "the Union represents and acknowledges that, except for this Severance Agreement and the Settlement Agreement . . . there are no other agreements or understandings, written or oral, between the Parties." It continues, "Approval of this Severance Agreement by the CHA's Board of Commissioners and by the United States Department of Housing and Urban Development (hereafter 'HUD') *and* approval of and execution of the Settlement Agreement . . . are conditions precedent to the Parties' obligations under this Severance Agreement." (Emphasis added.) The document continues, "In the event any provision of this Severance Agreement *and/or* the Settlement Agreement is found by any court, administrative agency, or other tribunal or entity of competent jurisdiction to be unenforceable or void as contrary to law . . . said finding or order shall be deemed a failure of a condition precedent to this Severance Agreement." (Emphasis added.)

The settlement agreement with the FOP also strongly evidences the fact that the two documents were connected. It contains condition precedent language that is similar to the language in the agreement with the Coalition. The agreement reads, moreover:

> Whereas the Union and the CHA have engaged in bargaining over the impact and effects of the CHA's decision to cease active operation of the CHAPD and the resulting permanent separation of all employees in the sworn bargaining unit and have reached agreement on all issues related to the decision or impact and effects of that decision, which agreement is memorialized *in a contemporaneously executed Severance Agreement*[.] (Emphasis added.)

Considering this evidence, the CHA has not established that the severance payments were voluntary and uncondi-

tional. In fact, all of the evidence shows that the CHA, rather than unconditionally giving its employees severance pay, made payments to the members of the unions in consideration for the unions' actions with respect to settlement of pending arbitrations, grievances, challenges to disciplinary matters, litigation, and unfair labor practices charges. As a result, Judge Lefkow did not err in failing to reduce the CHA's damages. *See, e.g.*, *Local Joint Executive Trust Fund v. Las Vegas Sands*, 244 F.3d 1152, 1159 (9th Cir. 2001) (severance and other payments and benefits made pursuant to agreements with plaintiffs' unions are not voluntary and unconditional, are required by legal obligation, and therefore are not deductible from liability); *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 152 (3rd Cir. 1998) (an employer was not entitled to reduce its damages based on payments made pursuant to an ERISA plan).

The CHA next argues that the class members waived their WARN claims through their unions' settlement agreements. The CHA, however, failed to raise this affirmative defense in its responsive pleadings, and the district court denied the CHA's motion for leave to file the additional defense, a decision we review for abuse of discretion. Because we hold that the district court did not abuse its discretion in denying the CHA's motion, there is no need to consider the merits of the CHA's argument on appeal.

Federal Rule of Civil Procedure 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading. We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived. *See, e.g.*, *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000). As we emphasized in *Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997):

> We recognize that the [affirmative] defense may have been meritorious; and [the plaintiff's] counsel should

> have had some inkling that the defense *might* be raised . . . . But . . . if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

(Emphasis in original.) Here, the employees filed their lawsuit on October 21, 1999, before settlement agreements with the unions were signed. On April 17, 2000, the CHA filed its first answer containing three affirmative defenses, and in February 2001 it filed its summary judgment motion. That motion was denied on June 21, 2001. It was not until 6 months later, on December 14, 2001, that the CHA filed a motion for leave to tack on additional defenses, including one that the employees waived their WARN Act claims. Judge Lefkow, considering the delay, denied the motion, emphasizing that until the denial of summary judgment, "the case was at a standstill due to CHA's motion practice." Although, on appeal, the CHA argues that the delay was "due to Plaintiff's motion practice" and attempts to minimize the delay caused by such "routine" matters as the substitution of its attorney, we emphasize that a district court is in a much better position than we to judge the course and progress of cases before it, and we will defer to the district judge's firsthand knowledge of the cause of delays unless its conclusion strikes us as completely unreasonable.

Judge Lefkow also emphasized that there was no excuse for the CHA's failure to raise its affirmative defense earlier. Noticeably, the fact that the CHA and the employees' unions signed a settlement agreement couldn't have been a surprise to the CHA. Indeed, the CHA relied on the severance agreements, signed at the same time, in its initial answer, which sought a reduction of damages under § 2104(a)(2)(B). Thus, it was irrelevant, as the CHA argues, that discovery in the case did not begin on the merits until December 2001. The CHA knew about the settlement

agreements from the beginning and could have raised its defense before the court decided the summary judgment motion. Considering these facts, we cannot say the district judge abused her discretion in denying the CHA's motion.

Finally, we do not believe the district judge abused her discretion in granting the employees' motion *in limine* prohibiting the CHA from presenting evidence regarding the class members' release of their WARN claims through the settlement agreements. And we agree that the employees did not impliedly consent to try the issue by discussing the agreements when introducing evidence regarding CHA's § 2104(a)(2)(B) defense.

The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*