IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2009 Session

**LAMAR ADVERTISING COMPANY**
**(formerly Outdoor Communications, Inc.)**
**v.**
**BY-PASS PARTNERS**

**Appeal from the Chancery Court for Madison County**
**No. 50768     John Franklin Murchison, Judge**

_____

**No. W2008-00645-COA-R3-CV - Filed July 22, 2009**

_____

This is a dispute over lease agreements. The plaintiff outdoor advertising company leased two parcels of property from the defendant real estate development company for the purpose of erecting billboard signs. The defendant then cancelled the leases. The defendant had contracted to sell the property to another outdoor advertising company, and cancelled the leases with the plaintiff in reliance on a lease provision allowing cancellation in the event that the plaintiff's signs interfered with the defendant's sale or development of the property. The plaintiff filed this lawsuit against the defendant, alleging that the defendant's cancellation was ineffective because this was not the type of interference that was contemplated in the agreement. The defendant counterclaimed, seeking damages allegedly suffered as a result of the plaintiff's failure to remove its billboards. Meanwhile, the third-party outdoor advertising company that was supposed to purchase the property filed a motion to intervene in the lawsuit, alleging that the plaintiff was interfering with its contractual relations with the defendant real estate development company. A trial was held, and no proof of damages was submitted. The defendant real estate development company and the third-party advertising company that sought to intervene asked for a hearing on damages in their post-trial brief. The trial court issued a letter ruling finding that the defendant's termination of the leases was effective. Years later, an order was entered reiterating the finding that the defendant effectively terminated the leases; the order set the matter for a special hearing on damages owed to the defendant real estate development company and the third-party advertising company. The third-party's motion to intervene was never explicitly granted. Shortly thereafter, the trial judge assigned to the case died. A substitute judge was assigned to hear the remainder of the case. In response to a series of motions, the trial court determined that the trial was properly bifurcated, that the third-party advertising company did not transfer its right to damages in a sale of its assets, and that its motion to intervene was never granted by the previous trial judge, and it therefore could not recover damages. The third-party advertising company now appeals. We reverse the trial court's decision that the motion to intervene was never granted, finding that the motion to intervene was implicitly granted in the order following the trial. We affirm the trial court's holding that the bifurcation was proper, that the defendant real estate development company effectively terminated the leases, and that the third-party

advertising company that sought to purchase the property retained the right to damages after the sale of its assets. The case is remanded for a hearing on the damages owed to the third-party advertising company, if any.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Larry A. Butler, Jackson, Tennessee, for the Appellant Long Outdoor Advertising

David Hardee and Magan N. White, Jackson, Tennessee, for the Appellee Lamar Advertising Company (formerly Outdoor Communication, Inc.)

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

In the late 1980s, Outdoor Communications, Inc. ("OCI")[1] entered into two lease agreements with By-Pass Partners ("By-Pass"), whereby OCI leased from By-Pass two parcels of land in Jackson, Tennessee. OCI constructed a billboard advertising sign on each parcel. Each lease had a term of five years, and each stated that the lease would continue in force from year to year for a period of seven years following the initial five-year period unless it was terminated at the end of the initial period or at the end of any additional year. The leases also provided that, after the first three years of the lease, in the event that OCI's sign structures interfered with the sale or development of the property, the lessor By-Pass could cancel the agreement by giving OCI sixty days' written notice.

In a letter dated April 3, 1995, By-Pass notified OCI that it was terminating the leases. In a subsequent letter dated June 2, 1995, By-Pass explained that it was terminating the leases because the leases and signs were interfering with By-Pass's sale and development of the property. By-Pass had entered into a contract to sell the parcels to Appellant Long Outdoor Advertising ("LOA"), a company formed in 1995 by Jimmy Wallace ("Wallace") and two other partners. Wallace was also the managing partner and ten percent owner of By-Pass.

On July 28, 1995, OCI filed the underlying lawsuit against By-Pass seeking, *inter alia*, a declaration that By-Pass did not have the right to terminate the leases. On August 17, 1995, By-Pass filed its answer and counterclaim, alleging that it suffered damages resulting from OCI's refusal to remove its signs. On August 25, 1995, LOA filed a motion to intervene under Rule 24 of the Tennessee Rules of Civil Procedure, and attached a complaint alleging a cause of action against OCI

---

[1] OCI is the predecessor of Plaintiff/Appellee Lamar Advertising Company.

for unlawful interference with the contractual relations between By-Pass and LOA.  LOA sought damages arising from OCI's refusal to relinquish possession of the billboard sites.

A trial on the matter was held before Chancellor Joe Morris on August 24, 1998, on the same day as a companion case, ***Rode Oil Co. v. Lamar Adver. Co.***, No. W2007-02017-COA-R3-CV, 2008 WL 4367300 (Tenn. Ct. App. Sept. 18, 2008), also involving OCI and LOA.  The testimony at trial focused primarily on the contractual provision that permitted By-Pass to terminate the leases in the event that OCI's signs interfered with the sale or development of the property.  No proof was submitted on the issue of damages.  In their post-trial memorandum, By-Pass and LOA claimed that, by implied consent, the parties had tried only the issue of whether By-Pass's termination of the leases was valid; accordingly, they asked the trial court to hold a hearing on the issue of damages in the event that the court found that the leases were validly terminated.

On November 17, 1998, the trial court issued a letter ruling finding in favor of By-Pass.  Following the letter ruling, no order was issued or entered by the trial court, so By-Pass and LOA requested a conference before Chancellor Morris, which was held in January 2001.  At the conference, By-Pass and LOA asked Chancellor Morris to enter an order consistent with the November 1998 letter ruling, to grant LOA's motion to intervene, and to order a hearing to address the damages incurred by By-Pass and LOA.  OCI challenged the request, arguing that there had been no implied consent at trial to reserve the damages issue for a later hearing and that By-Pass and LOA should not be given a second chance to put on proof of damages.  Chancellor Morris entered an order on February 1, 2001, ruling in favor of By-Pass and ordering a subsequent hearing to determine the damages incurred by By-Pass and LOA.

Discovery on the issue of damages began in October 2001.  Before any other proceedings were held, Chancellor Morris died.  The Tennessee Supreme Court designated retired Judge Franklin Murchison to hear the remainder of the case.

Meanwhile, on October 1, 1998, OCI had sold all of its assets to Lamar Advertising Company ("Lamar").  Consequently, on May 17, 2002, OCI filed a motion for Lamar to be substituted as the plaintiff.  This motion was later granted.

On December 15, 2003, Lamar filed a motion to dismiss any remaining claim for damages by LOA.  Lamar asserted that, after a series of acquisitions, Lamar actually owned LOA's damage claims, so there was no longer a justiciable controversy.  In addition, Lamar contended that the case should be dismissed because Chancellor Morris had improperly held that the trial was bifurcated.  On March 11, 2004, Judge Murchison held a hearing on Lamar's motion to dismiss.  On October 20, 2004, the trial court entered an order denying Lamar's motion to dismiss on the ground that Chancellor Morris had improperly held that the trial had been bifurcated.  The remaining portion of the motion, alleging that there was no justiciable controversy, was continued until an order was entered substituting Lamar as a party defendant.  On November 1, 2004, a second hearing was held on Lamar's motion to dismiss, and the trial court denied the motion in an order entered on December 1, 2004.

Meanwhile, on November 5, 2004, in light of Lamar's assertion that through acquisition it had acquired the rights to LOA's damage claims, LOA filed a motion asking the trial court to determine ownership of LOA's damage claims. On September 11, 2006, Lamar filed its own motion on the same issue, requesting the trial court to determine that any damages awarded to LOA are owned by Lamar. This was resolved on November 3, 2006; the trial court entered an order finding that LOA, not Lamar, owned any damage claims of LOA. The order also denied Lamar's motion to dismiss.

The parties then filed briefs addressing whether LOA had ever been made a party to the action, and thus whether LOA could assert a claim for damages. After a hearing on February 11, 2008, the trial court entered an order on March 3, 2008. In the order, the trial court held that LOA is not a party and was never made a party in this case because there was no written order entered explicitly granting LOA's motion to intervene and the February 2001 order did not do so because it failed to comply with Rule 24 of the Tennessee Rules of Civil Procedure. The trial court also denied LOA's motion to intervene. In light of these holdings, the trial court determined that LOA could not assert a claim for damages. LOA then filed a timely notice of appeal.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, LOA raises two issues for our review. It argues first that the trial court erred in finding that the order entered by Chancellor Morris on February 1, 2001 was insufficient to establish LOA as an intervening party under Tennessee Rule of Civil Procedure 24. Second, LOA asserts that the trial court should have found in the alternative that Lamar was judicially estopped from denying the status of LOA as a party. In the event that this Court finds that LOA is a proper party to this lawsuit, Lamar raises three issues for our review. First, Lamar contends that the trial court erred in holding that By-Pass could validly terminate the lease agreement. Second, Lamar argues that Judge Murchison erred in holding that Chancellor Morris properly bifurcated the liability issue from the damages issue. Third, Lamar asserts that the trial court erred in finding that LOA retained the right to damages after the series of acquisitions that resulted in Lamar's acquisition of LOA's assets.

A trial court's findings of fact are reviewed *de novo* upon the record with a presumption of correctness of the findings "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *Nashville Ford Tractor, Inc v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). Conclusions of law, however, are reviewed *de novo* without a presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) (citations omitted). The trial court's decision regarding whether Long Outdoor Advertising was properly made a party in this case by the February 1, 2001 order is an interpretation of a prior order, and is a question of law that this Court reviews *de novo*. *Hastings v. Hastings*, No. 01A01-9603-CH-00128, 1996 WL 33480501, at *2 (Tenn. Ct. App. Nov. 27, 1996).

-4-

## LOA Motion to Intervene

We begin by addressing the threshold issue of whether the February 1, 2001 order established LOA as an intervening party under Rule 24 of the Tennessee Rules of Civil Procedure. Lamar argues that LOA was never made a party to the action because no order was entered expressly permitting LOA to intervene and LOA's participation in the lawsuit, in and of itself, is insufficient to make it a party. Lamar cites ***Carson v. Challenger Corp.***, No. W2006-00558-COA-R3-CV, 2007 WL 177575 (Tenn. Ct. App. Jan. 25, 2007), in support of its argument.

In ***Carson***, the plaintiff, Mr. Carson*, *was a lessor of commercial property who sued his tenant for past due rent and other damages under the lease. *Id.* at *1. The defendant tenant argued that the doctrine of *res judicata* applied to bar Mr. Carson's suit. *Id.* at *3. The tenant's *res judicata* argument was based on Mr. Carson's participation in an earlier lawsuit regarding the same commercial property, filed by Mr. Carson's wife against the same tenant. *Id.* At the time, Mr. Carson and his wife were going through a divorce and she sued the tenant to collect rent payments, claiming that the underlying commercial realty was marital property. *Id.* at *1. Mr. Carson filed a motion to intervene in the wife's lawsuit; the trial court never ruled on the motion. *Id.* A consent order was ultimately entered dismissing the wife's lawsuit and disbursing the rent payments that the tenant had paid to the court clerk. *Id.* at *2.

This Court determined that Mr. Carson was not a party in the previous lawsuit filed by his wife, and therefore, the doctrine of *res judicata* did not apply to bar Mr. Carson's lawsuit against the tenant on the same property. *Id.* at *6. The Court noted that "intervention as of right" is not an absolute right. *Id.* at *4. Therefore, a person does not automatically become a party upon the filing of a motion to intervene. *Id.* The Court held that when a motion to intervene is filed but never granted, the movant does not become a party. *Id.* Mr. Carson had filed a motion to intervene in the prior proceedings, but he never became a party because no order was entered addressing the motion, either granting or denying his request. *Id.* The appellate court acknowledged that Mr. Carson took part in the prior proceedings by signing consent orders and filing motions, but rejected the contention that, by doing so, he effectively became a party. *Id.* at *5 (citing ***Boles v. Smith***, 37 Tenn. (5 Sneed) 105 (1857)). It determined that, because Mr. Carson was not a named party in the prior lawsuit, he could not have asserted his rights in the case, despite some level of participation in the litigation. *Id.*

In ***Carson***, however, we noted that "[t]he record before us does not contain an order granting or denying Mr. Carson's motion to intervene, and it appears that the motion was never addressed by the trial court." *Id.* at *1. The present case is distinguishable from ***Carson*** in that the record contains an order that LOA contends implicitly granted its motion to intervene. Therefore, we must examine Chancellor Morris's February 1, 2001 order in this case.

We first note the general rule used in construing orders and judgments:

The general rule is that a judgment should be so construed as to give effect to every part of it and where there are two possible interpretations that one will be adopted which is in harmony with the entire record, and is such as ought to have been rendered and is such as is within the jurisdictional power of the court. Moreover, the judgment will be read in the light of the pleadings and the other parts of the record.

***John Barb, Inc. v. Underwriters at Lloyds of London***, 653 S.W.2d 422, 423 (Tenn. Ct. App. 1983) (internal citation omitted) (quoting ***Grant v. Davis***, 8 Tenn. Ct. Civ. App. 315, 319 (Ct. App. 1918)).

The February 1, 2001 order was preceded by the January 2001 status conference requested by By-Pass and LOA. From the transcript of the conference, counsel for By-Pass and LOA asked the following of the trial court:

So three things . . . are needed in this case. Number one, an order is needed to be entered consistent with the Court's ruling by letter in November of '98.

Secondly, we're requesting that the Court also allow Long Outdoor or Rode – or excuse me, By Pass Partners to proceed with a separate hearing on their losses and damages as a result of the holding over of the sign sites.

And then thirdly, we're asking that the intervening complaint, the motion to intervene on behalf of Long Outdoor, that that be permitted solely for the purposes of proving of the damages.

Thus, in the status conference with Chancellor Morris, the fact that the trial court needed to act on LOA's motion to intervene was clearly brought to Chancellor Morris's attention.

As a result of the January 2001 status conference, Chancellor Morris entered the February 1, 2001 order. It provides as follows:

IN THE CHANCERY COURT OF MADISON COUNTY, TENNESSEE

OUTDOOR COMMUNICATIONS, INC.,

       Plaintiff,

VS.                                              R.D. No. 50768

BY-PASS PARTNERS and LONG
OUTDOOR ADVERTISING,

       Defendants.

**<u>ORDER</u>**

This matter came to be heard on August 24, 1998, upon the "Complaint for Declaratory Judgment and Breach of Lease Agreement" filed by Outdoor Communications, Inc. as Plaintiff ("OCI"), the "Answer and Counterclaim of By-Pass Partners", the Third Party "Complaint" filed against OCI by Long Outdoor Advertising ("LOA"), testimony of witnesses and the entire record in this cause, from all of which it appears as follows:

(1) The primary issue in the trial was whether By-Pass Partners effectively terminated the sign leases with OCI when it gave its written notice of termination to OCI on April 3, 1995 as supplemented by termination letter sent to OCI on June 2, 1995.

(2) The Court hereby finds that the aforedescribed letters were sufficient to terminate the sign leases in question.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that judgment on the issue of termination of the sign leases is hereby entered in favor of By-Pass Partners;

**AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that this matter shall be set for special hearing on the issue of damages that might accrue to By-Pass Partners and Long Outdoor Advertising.

Enter this 1st day of Feb., 2001.

/s/
HONORABLE JOE C. MORRIS

LOA concedes that this order includes no language explicitly granting its motion to intervene. It maintains, however, that the order implicitly grants the motion. LOA relies on the fact that its name is included in the style of the case, that the order states that LOA filed a complaint against OCI, and that the trial court set the matter for a special hearing on the issue of damages owed to both By-Pass and LOA. All of these facts, LOA argues, indicate that the order was intended by Chancellor Morris to make LOA a party. In response, Lamar argues that, because a complaint is supposed to be filed after a motion to intervene is granted[2] and the order erroneously says that LOA's complaint

---

[2]In its brief, Lamar quotes the following passage from the excellent treatise written by Professors Banks and Entman on the procedure to be followed by a party whose motion to intervene has been granted:

Presumably, the intervenor should then file and serve the proposed complaint or answer that was included with the motion for intervention. If the intervenor asserts a claim, the party against whom the claim is asserted is required to serve a responsive pleading or motion within the time provided in Rule 12.01. The intervenor's pleading may be served under Rule 5 on those already parties, while

(continued...)

was filed, the order seems to assume that the motion to intervene had already been granted, which it had not, and the order, therefore, did not grant the motion to intervene.

Without question, the February 1, 2001 order is inartfully drawn. While it refers to LOA as a party, it incorrectly identifies LOA as a defendant, when LOA's status, if any, would be as an intervening plaintiff. The order also refers to LOA's complaint against OCI as having been filed, when in fact it was not filed, but rather was included as an exhibit to LOA's motion to intervene. The order did, however, include the trial court's finding contained in the 1998 letter ruling that By-Pass effectively terminated the leases with OCI, and also stated that a special hearing would be set to address the issue of damages, if any, incurred by By-Pass and LOA; both of these rulings had been requested by counsel for By-Pass and LOA. Moreover, the issue of LOA's motion to intervene had been clearly put before Chancellor Morris. We must construe the order in light of "other parts of the record" and "give effect to every part of [the order]."[3] *See John Barb, Inc.*, 653 S.W.2d at 423. The construction urged by Lamar would render meaningless the language in the order that expressly grants to LOA a hearing on its damages. Under all of these circumstances, we must conclude that the February 1, 2001 order effectively granted LOA's motion to intervene.

## Bifurcation

Having determined that LOA is a proper party to the lawsuit, we now address the issues raised by Lamar. We first consider Lamar's argument that the trial court erred in holding that the liability issue was bifurcated from the damages issue.

Lamar argues that even if the February 1, 2001 order is deemed to have granted LOA's motion to intervene, the order was entered after the August 1998 trial. Thus, LOA was not yet a party at the time of trial and could not have reserved the issue of damages for a later hearing. Rule 42 of the Tennessee Rules of Civil Procedure governs the bifurcation of trials. It provides as follows:

> The court for convenience or to avoid prejudice may in jury trials order a separate trial of any one or more claims, cross-claims, counterclaims, or third-party claims,

---

[2](...continued)
service under Rule 4 would be required on any new parties added by the pleading. As a party, the intervenor will be subject to all the duties and responsibilities of a party, including payment of costs.

ROBERT BANKS, JR. & JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 6-9(m) (2d ed. 2004). Lamar does not argue that LOA's failure to actually file its complaint after the February 1, 2001 order prevented it from becoming a party. Rather, Lamar discussed the procedure to support its argument that the February 1, 2001 order should not be interpreted to be an order granting LOA's motion to intervene.

[3] Because we have determined that the trial court's February 1, 2001 order implicitly granted LOA's motion to intervene, we do not reach the issue of whether Lamar was judicially estopped from denying the status of LOA as a party.

or issues on which a jury trial has been waived by all parties. For the same purposes the Court may, in nonjury trials, order a separate trial of any one or more claims, cross-claims, counterclaims, third-party claims, or issues.

Tenn. R. Civ. P. 42.02. The Rule does not address when, or if, a motion to bifurcate must be made to preserve the issue. The parties have pointed to no Tennessee case addressing this issue, and we have found none. However, because Tennessee Rule of Civil Procedure 42.02 is patterned after Rule 42(b) of the Federal Rules of Civil Procedure,[4] we look to federal case law for guidance. *See Mullins v. Long*, 1987 WL 18907, at *1 (Tenn. Ct. App. Oct. 27, 1987); *see also Thomas v. Oldfield*, 279 S.W.3d 259, 262 n.3 (Tenn. 2009) (citation omitted).

In *Saxion v. Titan-C-Manufacturing, Inc.*, 86 F.3d 553 (6th Cir 1996), the Sixth Circuit addressed whether the district court abused its discretion in bifurcating the issues of liability and damages after the close of the plaintiffs' proof. *Id.* at 556. The defendants filed a motion to dismiss after the plaintiffs rested without putting on proof of their damages. *Id.* During the course of the argument on the motion to dismiss, it became obvious to the district court judge that the parties had been proceeding under differing understandings as to the scope of the trial, with the plaintiffs believing that the trial was limited to the issue of liability and the defendants believing that the plaintiffs were expected to put on proof of damages during the initial bench trial. *Id.* The district court determined that there had been a genuine misunderstanding regarding the scope of the trial, and because it was unable to determine whose understanding was correct, it bifurcated the issues of liability and damages. *Id.*

In affirming the district court's decision, the Sixth Circuit noted that although usually one of the parties will move for bifurcation before the start of trial, there was no formal requirement for such a procedure. *Id.* In fact, the Sixth Circuit had previously recognized that it is not necessarily an abuse of discretion for the trial court to "separat[e] the issues of liability and damages 'at the virtual close of plaintiff's proofs.'" *Id.* (quoting *Helminski v. Ayerst Labs.*, 766 F.2d 208, 212 (6th Cir. 1985)). The *Saxion* court also observed that the language in Rule 42(b) suggests that the decision to bifurcate a trial may be made on the trial court's own motion. *Id.*

Like Federal Rule 42(b), Tennessee Rule of Civil Procedure 42.02 does not mandate that a party explicitly reserve the issue of damages in order for the trial court to properly bifurcate the trial. Therefore, LOA was not required to explicitly reserve the issue of damages for a later hearing in order for Chancellor Morris to properly bifurcate the trial. Therefore, the fact that LOA was not a party at the time of trial did not preclude the trial court from bifurcating the issues of liability and damages.

---

[4] Federal Rule of Civil Procedure 42(b) provides in pertinent part as follows: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b).

Lamar also argues that the trial court erred in deciding to bifurcate the case. The decision of whether to bifurcate a trial is within the broad discretion of the trial court. ***Ennix v. Clay***, 703 S.W.2d 137, 139 (Tenn. 1986). However, this discretion must be exercised with the following considerations in mind:

> [T]he interests of justice will warrant a bifurcation of the issues in only the most exceptional cases and upon a strong showing of necessity. In making its decision the trial court should consider the possibility of juror confusion, the risk of prejudice to either party, and the needs of judicial efficiency. Above all, the issues at trial must not be bifurcated unless the issue to be tried is so distinct and separable from the others that a trial of it alone may be had without injustice.

***Id.*** (citing ***Gasoline Prods. Co., Inc. v. Champlin Ref. Co.***, 283 U.S. 494, 500 (1931)).

Lamar argues that it was prejudiced by the decision to bifurcate the trial. Because LOA was not a party to the lawsuit at the time of the August 1998 trial, Lamar contends, the granting of LOA's request to bifurcate in the February 1, 2001 order enabled a new party to bring additional claims for damages against Lamar.

Lamar also argues that bifurcation in this instance did not promote judicial efficiency. It claims that, had both the liability and damage issues been addressed at trial, the proceedings would have concluded years earlier. Bifurcation, Lamar maintains, resulted in the proceedings being significantly prolonged, with the hearing on damages not held until 2007.

In response, LOA argues that there was a basic misunderstanding as to the scope of the trial. LOA points to the fact that, prior to the trial, there was no discovery on the issue of damages, and that its pre-trial brief did not address damages. In addition, the underlying case and the companion ***Rode Oil*** case were both set for trial on the same day, both before Chancellor Morris. LOA contends that all of these facts indicate that the parties were proceeding under the understanding that the damages issue would be addressed at a later hearing. LOA also argues that judicial efficiency would not have been furthered by presenting proof of damages, because the foundational issue of the liability under the lease agreements had to first be determined by the trial court.

We are not persuaded by Lamar's contention that it was prejudiced by bifurcation. Although LOA was not a party at trial, it certainly participated in the litigation. So Lamar was well aware of LOA's claims by the time of the February 1, 2001 order that implicitly granted LOA's motion to intervene and held that the trial was bifurcated. Moreover, Chancellor Morris, having tried the case, was in the best position to determine the parties' respective understandings of the scope of the trial. Most importantly, however, the issues of liability and damages are not so intertwined in this case that separating the two issues would cause injustice. Indeed, the issue of damages could not be decided, and LOA need not be permitted to intervene, unless and until the trial court determined whether By-Pass could terminate the leases. Accordingly, we cannot conclude that the trial court abused its discretion in bifurcating the issues of liability and damages.

**Lease Termination**

Next, Lamar argues that the trial court erred in determining that By-Pass was within its rights to terminate the lease agreements. The provision on which By-Pass relies in its termination of the leases states as follows: "After the initial three years of the lease agreement [By-Pass] may cancel this agreement by giving [OCI] 60 days advance written notice in the event sign structures interfere with the sale or development of the above said describe [sic] property."

Lamar argues that By-Pass did not exercise its right to terminate the lease agreements in good faith, and therefore, the termination of the lease agreements was not effective. Specifically, Lamar contends that By-Pass's attempt to sell the two small parcels of property on which OCI's signs were erected is not the type of "interference" contemplated by the parties when they entered into the leases. Lamar's argument suggests that the "above said describe[d] property" language in the lease provision referred to interference with the sale or development of the larger sixty-six-acre tract of land of which the sign sites were a part, rather than simply the individual sign sites. Lamar also asserts that Wallace, as a partner in LOA and a part-owner in By-Pass, manufactured the interference by forming LOA in order to purchase the property from By-Pass, enabling LOA to compete with Lamar's predecessor, OCI.

In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979)). The purpose of this implied covenant is (1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered. *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642–43 (Tenn. Ct. App. 2006) (quoting *Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005)). "The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Id.* (quoting *Goot*, 2005 WL 3031638, at *7).

The determination of what is required by the duty of good faith in a given case turns on an interpretation of the contract at issue. *Id.* "In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *Id.* (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). Whether a party acted in good faith is a question of fact. *Old Republic Sur. Co. v. Eshaghpour*, No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *7 (Tenn. Ct. App. Nov. 30, 2001).

The provision at issue allows the leases to be cancelled if three requirements are met. The cancellation provision (1) may only be exercised after the first three years of the lease, (2) requires sixty days' written notice of the cancellation, and (3) requires that the sign structures interfere with By-Pass's sale or development of the property.

The first requirement was clearly met. The two leases at issue are dated November 1, 1988 and May 16, 1990. By-Pass did not seek to terminate the leases until 1995, well after the initial three-year lease period. The second requirement in the lease provision was also met. By-Pass first gave OCI written notice of the termination by way of a letter dated April 3, 1995. This was followed by another letter dated June 2, 1995. This second letter again gave OCI notice of the termination, and it also informed OCI of the reason for the termination. Therefore, if the circumstances permitted By-Pass to terminate the lease, the termination would have been effective, at the latest, sixty days after the June 2, 1995 letter informing OCI of the reason for termination.

The issue then becomes whether OCI's "sign structures interfere[d] with [By-Pass's] sale or development of the . . . property" referred to in the leases. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703–04 (Tenn. 2008) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). If the contract language is clear and unambiguous, then its literal meaning controls the outcome. *Id.* (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). "In such a case, the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.' " *Id.* (citing *Bob Pearsall Motors, Inc.*, 521 S.W.2d at 580; *Planters Gin Co.*, 78 S.W.3d at 890).

"The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way." *VanBebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007) (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). However, a contract is not ambiguous simply because the parties have different interpretations of its provisions, *Clear Channel Outdoor, Inc. v. A Quality, Inc.*, 250 S.W.3d 860, 863 (Tenn. Ct. App. 2007) (citing *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994)), and this Court will not place a strained construction on the language of the contract in order to create ambiguity where none exists. *Maggart*, 259 S.W.3d at 704 (citing *Farmers-Peoples Bank*, 519 S.W.2d at 805). "Determining whether a contractual provision is ambiguous is a question of law." *Eatherly Const. Co. v. HTI Mem'l Hosp.*, No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *12 (Tenn. Ct. App. Sept. 12, 2005) (citation omitted).

We first observe that the language of the provision at issue is quite broad. The leases do not require the interference to rise to the level of preventing By-Pass's sale or development of the property. The word "interfere," means simply "to interpose in a way that hinders or impedes," MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 610 (10th ed. 1995), which would include making the sale or development of the property more difficult or expensive. In the trial court below, the president of OCI, A.B. Isbell ("Isbell"), testified that By-Pass's sale of the property to LOA could not be consummated until the leases with OCI were terminated. The trial court was entitled to credit this testimony, and we give great deference to its determination of the witnesses' credibility. *See Keaton v. Hancock County Bd. of Educ.*, 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003).

The lease termination provision does not exclude sale of the property to persons or entities affiliated with By-Pass. Therefore, under a plain reading of the provision, By-Pass may sell the property to anyone it chooses, and if the sign structures interfere with the sale, then By-Pass is within its rights to terminate the leases.

Finally, we must determine whether the reference in the lease termination provision to the "above said describe[d] property" refers to the sign sites themselves or to the larger tract of adjacent property owned by By-Pass. A review of the leases reveals that the property descriptions in the leases were of the sign sites leased by OCI. The November 1, 1988 lease described the property as "Hwy 45 By-Pass North[,] 2,100 feet north of Old Humboldt Road[,] Jackson, Tennessee," and the May 16, 1990 lease described the property as "Hwy 45 By-Pass North[,] 1,098 feet north of Old Humboldt Road[,] Jackson, Tennessee." In fact, OCI president Isbell admitted at trial that the properties described in the leases were the sign sites, not the entire sixty-six acre parcel owned by By-Pass.

From our review of the leases, we must conclude that the language in the lease termination provision is clear and unambiguous. Based on a plain reading of the lease agreements, we find no error in the trial court's holding that the sign structures erected by OCI under the lease agreements interfere with By-Pass's sale of the sign sites to LOA, such that By-Pass's letters to OCI effectively terminated the lease agreements.

Lamar contends that By-Pass did not act in good faith when it terminated the leases. Because Wallace was a part-owner in both By-Pass and LOA, Lamar contends that the "interference" with By-Pass's sale to LOA was manufactured to create a competitive advantage in LOA's competition with Lamar's predecessor, OCI. The trial court did not make an explicit finding that By-Pass acted in good faith in terminating the leases with OCI. However, such a finding was implicit in the trial court's conclusion that By-Pass effectively terminated the leases by way of the letters dated April 3 and June 2, 1995. The trial court's findings of fact, whether explicit or implicit, are entitled to a presumption of correctness. *See C.R. Batts Constr., LLC v. 101 Constr. Co.*, No. M2004-00322-COA-R3-CV, 2005 WL 1848495, at *2 (Tenn. Ct. App. Aug. 4, 2005) (citation omitted). From our review of the overall record, we cannot conclude that the evidence preponderates against the trial court's implicit finding that By-Pass acted in good faith in terminating the leases with OCI.

### Ownership of LOA Right to Damages

Finally, Lamar contends that, after a series of acquisitions, Lamar now owns the right to any damages that the court may award to LOA against OCI/Lamar. On July 31, 1997, LOA entered into an Asset Purchase Agreement ("Agreement") with Delite Outdoor Advertising of Tennessee, Inc. ("Delite"). Under this agreement, LOA sold substantially all of its assets to Delite. Several years later, on April 1, 2001, Lamar purchased Delite's assets. Therefore, to determine whether Lamar now owns LOA's right to any damages, we look to the Agreement entered into between LOA and Delite, in order to ascertain whether LOA transferred its right to damages to Delite, which subsequently were transferred to Lamar in its acquisition of Delite.

The Agreement addresses, in general terms, the assets that LOA conveyed to Delite. It states as follows:

1.) Purchase and Sale of Assets - Subject to the provisions of this Agreement, on the Closing of this Agreement, [LOA] shall transfer, sell, and assign to [Delite], and [Delite] shall purchase from [LOA], all of [LOA's] right, title, and interest in and to all of the tangible and intangible assets used in the operation of [LOA's] Business, wherever located.

This provision is then followed by a specific list of assets being transferred to Delite in the transaction. The list includes, among other things, LOA's advertising structures, advertising contracts, business records, and trademarks and trade names. The list does not refer to claims, choses in action, or other language that could be read to include the claim for damages in this litigation. It does, however, include a broad catch-all provision that states as follows:

(h) Other Property. All other tangible and intangible property, machinery, equipment and fixed assets of [LOA] relating to or used in connection with or in the operation of the Assets or the Business, including the property, machinery, equipment and fixed assets identified on Exhibit 1(h), attached hereto.

In addition, the first section of the Agreement specifically excludes from the sale LOA's cash as of the date of closing, refunds due to LOA from the Jackson Utility Division on a specific parcel of property, and specific computer equipment.

Lamar argues that, under these provisions of the Agreement, Delite acquired all of LOA's assets except for those specifically excluded, and because LOA's damage claim was not specifically excluded, the damage claim must be deemed to have been transferred to Delite and then to Lamar. LOA, on the other hand, interprets these provisions as conveying only assets that are used in connection with or in the operation of the business, and because a damage claim is not an asset that is used in connection with the business, it was not conveyed to Delite in the Agreement.

The trial court, of course, held that LOA retained its right to any damages awarded to it in the proceedings. In doing so, the trial court relied on another provision in the Agreement that specifically addresses the litigation concerning the sign sites at issue. The provision, entitled "Litigation Leases," recognizes that the OCI sign sites at issue, as well as two other sites, are involved in litigation, and sets forth LOA's obligations to Delite arising out of the litigation. Under the provision, LOA is required to keep Delite periodically informed of the status of the litigation and to consult with Delite before settling the cases. If the litigation results in a final determination in favor of LOA, LOA must transfer a lease for the sites at issue to Delite within ten days of such final determination. If the litigation results in a final determination adverse to LOA, LOA must transfer a new lease to Delite for the sites at issue within thirty days after the expiration of the currently existing leases on the sites. Finally, Delite is required to pay LOA a finder's fee for each lease transferred to Delite under this provision.

Thus, the "Litigation Leases" provision in the agreement between LOA and Delite details the parties' obligations relative to the litigation on the OCI sign sites at issue. In holding that LOA did not convey to Delite its right to damages in the instant litigation, the trial court found that, had the parties intended that the damage claim be conveyed under the terms of the Asset Purchase Agreement, then specific language to that effect would have been included in this provision. We agree. In contract interpretation, it is well-settled that the "particular and specific provisions of a contract prevail over general provisions." ***Precision Mech. Contractors v. Metro. Dev. & Hous. Agency***, No. M2000-02117-COA-R3-CV, 2001 WL 1285900, at *5 (Tenn. Ct. App. Oct. 25, 2001) (citing ***S. Sur. Co. v. Town of Greenville***, 261 F. 929 (6th Cir. 1920)). Said another way:

> Where the parties express themselves in reference to a particular matter, the attention is directed to that, and it must be assumed that it expresses their intent, whereas a reference to some general matter, within which the particular matter may be included, does not necessarily indicate that the parties had the particular matter in mind.

17A AM. JUR. 2D *Contracts* § 363 (2004). Here, although there is very general language addressing the sale of LOA's assets, we are persuaded that the "Litigation Leases" provision is determinative. The "Litigation Leases" provision contains no mention of LOA assigning to Delite any damage award in connection with the sign sites at issue. Therefore, we affirm the trial court's holding that LOA's damage claim was not transferred to Delite under the terms of the Asset Purchase Agreement, and accordingly, was not acquired by Lamar; rather, LOA retained the right to any damages that may be awarded in this case.

### CONCLUSION

For the reasons stated above, we reverse the trial court's decision that the February 1, 2001 order did not grant LOA's motion to intervene, and find that LOA is a proper intervening party in these proceedings. We affirm the trial court's remaining holdings, and remand the cause to the trial court for a determination of the damages incurred by LOA, if any.

The decision of the trial court is affirmed in part, reversed in part, as set forth above, and remanded for further proceedings not inconsistent with this opinion. The costs on appeal are taxed to the Appellee Lamar Advertising Company, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE