IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 10, 2022 Session

**BRIAN BOLING v. SPIREON, INC.**

**Appeal from the Circuit Court for Knox County**
**No. 3-343-18 Deborah C. Stevens, Judge**

_____

**No. E2021-00598-COA-R3-CV**

_____

This appeal involves a contractual dispute related to the plaintiff's employment. The trial court granted summary judgment to the defendant. The plaintiff appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and KRISTI M. DAVIS, JJ., joined.

W. Edward Shipe, R. Cuyler Haskins, and Avery C. Lovingfoss, Knoxville, Tennessee, for the appellant, Brian Boling.

Taylor A. Williams and Lindsey M. Collins, Knoxville, Tennessee, for the appellee, Spireon, Inc.

**OPINION**

**I. BACKGROUND**

This matter arises from the sale of a company named Spireon. Brian Boling, Spireon's previous CEO, asserts that the company treated him wrongfully during the sale in regard to certain contractual rights held by Boling as co-founder of Spireon. According to Boling, Spireon attempted to close the sale, distribute the proceeds, and exclude payment for Boling's rights.[1] Spireon argues in response that Boling seeks to renegotiate his remuneration years after he resigned and signed an all-encompassing, fully-integrated

---

[1] Boling opines that Spireon was unhappy with business decisions he made subsequent to leaving the company and after the expiration of his non-compete agreement.

separation agreement that limited his compensation.

In order to better understand the dispute before us, some background information is required. In 2011, Spireon, then known as ProconGPS, Inc., began discussions with Bertram Capital Management, LLC, ("Bertram Capital") a venture capital firm, to introduce Bertram Capital as a new majority shareholder. One significant purpose of the venture capital investment was to seek a short-to-mid-term sale of Spireon, thus allowing both the prior shareholders and Bertram Capital to receive a return on investment. In order to proceed with the sale, Bertram Capital required that co-founder/CEO Boling agree to continue as CEO after the sale.[2] Boling acknowledges that he was positioned to, and did, actively negotiate special protections for his interest and that held by Tim Welch in the event Spireon terminated their employment without cause.

Spireon created a "Management Phantom Equity Plan" ("Plan"), dated February 16, 2011, to "offer selected persons a proprietary interest in the success of [Spireon] through the grant of Incentive Units." Rather than grant stock options or ownership, the Plan created a Bonus Pool from the proceeds of any Liquidity Event and granted management rights to receive portions of that Bonus Pool through the grant of these "Incentive Units." Incentive Units are what is known as a dilutable interest ("Outstanding Incentive Units shall not be adjusted upon the subsequent issuance of Incentive Unit awards under the Plan."), which means that an Incentive Unit can decrease in value because it is not fixed as a percentage of the future Bonus Pool; instead, Spireon has the ability to grant additional Incentive Units that reduce a current holder's future claim. The Bonus Pool is defined as a percentage of the Net Equity Proceeds, which do not exist until there is a sale of the company ("Upon a Liquidity Event other than an IPO, a bonus pool shall be established equal to 12% of the Net Equity Proceeds."). Generally, the Net Equity Proceeds are the sale proceeds less expenses.

Boling claims that the Plan is both a macro document, meant to govern unnamed current and future management of Spireon, and a micro document narrowly focused on Boling's and Welch's special rights as senior management. Boling asserts that he was given additional protections of his right to receive management incentives. He contends that the parties agreed Spireon should not be permitted to use a termination without cause to deprive Boling of his full management bonus.[3]

---

[2] Boling and the other co-founder, Tim Welch, surrendered majority control of Spireon as part of the deal.

[3] Section 11 of the Plan dealt with the rights specifically granted to Boling and Welch: "In the event Brian Boling or Tim Welch are terminated by the Company other than for cause, death or disability, they shall be entitled to elect, by written notice to the Company within thirty (30) days of the termination date, to . . . convert their outstanding vested Incentive Units into a non-dilutable interest[.]" Interestingly, Welch has no specific recollection of the conversations discussing the conversion.

Under the macro portion, distribution of the Bonus Pool is governed by Section 8 of the Plan. Section 8(a) provides that "[i]n the event of a Liquidity Event other than an IPO, if the conditions for distribution set forth in the Plan are satisfied, the Bonus Pool will be distributed as follows . . . [.] This section includes the provision in dispute here, Section 8(c), which places an expiration date on distributions of the Bonus Pool, stating that "[n]otwithstanding anything to the contrary herein, in no event will a distribution upon a Liquidity Event be made to any Participant who has terminated his or her relationship as an employee or consultant of the Company or Company subsidiary more than five (5) years prior to the closing date of such Liquidity Event."

Section 7 of the Plan creates the Bonus Pool for the macro portion of the Plan as "12% of the Net Equity Proceeds" but, according to Boling, the founder-specific Section 10 modifies Section 7 by redefining the Bonus Pool. He asserts that the decision to address this carve-out in Section 10 rather than simply adding language to Section 7 confirms the founder-specific focus of Sections 10 and 11 because those sections isolate and treat separately those specific rights granted to Boling and Welch from the general macro rights to unnamed management. Similarly, Boling claims this ordering confirms and is consistent with the view that the macro-focused Sections 6 and 8 deal only with distributions of the Bonus Pool for the "macro" participants, not Boling's interest. Further, he contends that the "other than" clause in Section 12 of the Plan expressly excludes his rights from reduction to the size of the Bonus Pool. Collectively, according to Boling, these provisions serve to put a protective barrier around the Bonus Pool for management with only a single exception – Boling's surrender and conversion rights as founder of Spireon.

Boling's employment with Spireon ended effective October 1, 2013. On October 19, 2013, Boling exercised his right to surrender and convert his interest.[4] Boling entered into a confidential Settlement and Release Agreement ("Separation Agreement"), dated October 22, 2013. The Separation Agreement expressly indicates that Boling and Spireon "desire to resolve and completely settle any and all claims that now exist or may hereinafter arise between them regarding" Boling's employment. Paragraph 10.5 states that the Separation Agreement, "contain[s] the entire agreement between [the parties], and . . . supersedes any other agreement either oral or in writing between the parties."

Paragraph 2.3(a) of the Separation Agreement provides that upon Boling's departure, he would cease participating in any of Spireon's benefits plans, and any right to receive existing benefits from those plans would be governed by the Separation Agreement and the terms of the respective plans. Paragraph 2.3(a) explicitly provides that Boling is not entitled to any other compensation, bonus, commission, or other benefit except as set

---

[4] Spireon, Boling, and a number of companies associated with Boling subsequently engaged in contentious litigation unrelated to this dispute, which is now resolved. *See, e.g.*, *Spireon, Inc. v. Procon Analytics, LLC and Brian Boling*, No. 8:17-cv-02191-JLS-KES, 2018 WL 3004591 (C.D. Cal. Mar. 12, 2018); *see also Boling et al. v. Spireon*, No. 3-138-18, Knox County (Tenn.) Circuit Court.

forth in the Separation Agreement. Paragraph 2.3(b) of the Separation Agreement expressly notes as follows:

> Employee shall retain all rights to elect, by written notice to the Employer within thirty (30) days of the termination date, to either (A) have his outstanding Incentive Units immediately vest in the amount that would have vested had he otherwise remained employed through the end of his twelve (12) month severance period . . . or (B) convert his outstanding vested Incentive Units into a non-dilutable interest in the [Plan] (expressed as a percentage of the Bonus Pool, as such term is defined in the [Plan]) equal to the product of (x) the quotient, the numerator of which is the number of Employee's vested Units as of June 10, 2013 (15,750) and denominator of which is the total number of Units outstanding under the Plan as of the executive of the First Amendment to the Employment Agreement (113,000), and (y) 0.5=6.97%.

Boling selected the second option, a "non-dilutable interest in the Plan," which would be "expressed as a percentage of the Bonus Pool." Under the Separation Agreement, Boling was vested in 15,750 Incentive Units at the time of his departure, which represented 13.94% of the total outstanding Incentive Units in the Plan. According to Boling, when he elected to convert his Incentive Units into the non-dilutable interest, he was then entitled to a non-dilutable interest of 6.97%. Boling claims he has ownership in a non-dilutable interest in 0.84% of the Net Equity Proceeds of any Liquidity Event, separate from the Bonus Pool that makes up the Plan.

Boling asserts that his surrender and conversion involves a non-dilutable interest categorically different from the Incentive Units held by other current and former employees, specifically in that it has no expiration date. He claims that the parties intended to exclude the non-dilutable interest from the strictures of the Plan, including the expiration date. He contends that the intent of the parties was to treat the non-dilutable interest as akin to common stock, which does not expire. According to Boling, his non-dilutable interest fell outside of the Plan; instead, it became an exclusive right to the isolated portion of the former Bonus Pool.

Spireon argues that the Separation Agreement contains no language suggesting that the conversion somehow shifted Boling's interest "outside the Plan." Spireon asserts that the Separation Agreement rather reaffirmed Boling's "entitlement to receive any vested accrued benefits [ . . .] shall be determined in accordance with and governed by the respective terms of such plans and this Agreement." Spireon claims the Separation Agreement kept Boling's "non-dilutable interest" in the Plan and "expressed as a percentage of the Bonus Pool." According to Spireon, if the parties intended Boling's interest to move "outside" the Plan upon conversion, such would have been indicated in any of the applicable writings. Rather, Boling identifies no language to support his

- 4 -

assertions. As argued by Spireon, the claimed "additional protections" do not exist, there is no ambiguity as to the five-year limitation, and parol evidence cannot be used to modify the Plan. The five-year limitation applies to all rights to payments or distributions from the Plan.

Spireon notes that the Plan only provides "phantom equity," which is not actual equity ownership. Section 14 of the Plan states that "[n]either the Plan nor any distribution hereunder creates or conveys any equity or ownership interest in [Spireon]." Spireon contends that unlike true equity ownership, a participant's right to distribution from the Plan is not an asset and does not last forever. Spireon claims that Section 8(c) of the Plan specifically prohibits distributions to participants that have not worked for Spireon within the five years prior to the closing of a Liquidity Event:

> Notwithstanding anything to the contrary herein, in no event will a distribution upon a Liquidity Event be made to any Participant who has terminated his or her relationship as an employee or consultant of the Company or Company subsidiary more than five (5) years prior to the closing date of such Liquidity Event.

On September 6, 2018, Spireon entered into an Agreement and Plan of Merger ("Merger Agreement"). Five years and five days after Boling surrendered and converted his interest, Spireon's stockholders sold their shares to Greenbriar Capital, triggering the distribution requirement for shareholders under the Plan. Spireon contends that because Boling resigned effective October 1, 2013, his right to receive a distribution expired before October 1, 2018, as the closing date of the Liquidity Event ("Merger") was October 5, 2018. The parties now disagree whether the surrender of Boling's Incentive Units and conversion into a non-dilutable interest subjected his interest to the five-year expiration provision in Section 8(c) of the Plan or whether Boling, a co-founder, had different rights.

Boling filed this action seeking additional compensation on September 28, 2018. He soon filed a first amended complaint, asserting the contract claims at issue. Spireon filed a motion for summary judgment based upon the Plan's five-year limitation. After a hearing on the motion, the trial court granted summary judgment to Spireon on May 5, 2021. The trial court agreed with Spireon that (1) the five-year limitation was clear; (2) it applied to Boling; and (3) Boling could not re-write the contractual documents at issue using extrinsic evidence. The court noted that it had "been unable to find any reference to the converted interest . . . as 'non-expiring.' The conversion rights are titled and referred to only as non-dilutable." Boling thereafter filed a timely notice of appeal.

## II. ISSUES

The issues raised by Boling are restated as follows:

A. Did the trial court err in interpreting the contracts at issue.

B. Did the trial court err in finding the contracts unambiguous.

## III. STANDARD OF REVIEW

A moving party is entitled to summary judgment if it can demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The standard of review on appeal for a trial court's grant of summary judgment is de novo with no presumption of correctness.

## IV. DISCUSSION

Boling contends that the rule of practical construction accurately reveals the parties' intent that Boling's non-dilutable interest be non-expiring. He asserts that the trial court erred by ignoring the interpretation placed on the contracts in favor of a strict textualist approach, an approach he claims was rejected by the Tennessee Supreme Court in *Individual Healthcare Specialists v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671 (Tenn. 2019). Boling notes that the text alone supports his interpretation that his non-dilutable interest does not expire. Alternatively, Boling contends that Section 8(c) of the Plan is ambiguous and this court should consider the evidence he filed to discern the intent of the parties.

Spireon asserts that nothing in any of the written documents exempts Boling from the five-year limitation. According to Spireon, Section 8(c) of the Plan applies to all participants and all distributions. Spireon argues that the Separation Agreement plainly contemplates that Boling's interest was time-limited. Spireon notes that Paragraph 3.3 of the Separation Agreement provides that Boling could perform "additional work" as a consultant for Spireon, but "[a]ny such additional work . . . will not be considered as 'providing service' to [Spireon] pursuant to the terms of the [Plan]." Spireon points out that this provision demonstrates that the parties intended to start the running of the clock on Boling's interest upon his departure, and that any subsequent consultant work would not extend expiration of his interest. According to Spireon, if Boling's interest were non-expiring, there would be no reason for Paragraph 3.3 to address Boling's interest in the Plan.

Spireon further argues that the parol evidence rule in Tennessee is most restrictive when the contract at issue is fully integrated. *Individual Healthcare Specialists*, 566 S.W.3d at 696. The rule requires that where, as here, a court is "interpreting a fully integrated contract, extrinsic evidence may be used to put the written terms of the contract

into context, but it may not be used to vary, contradict, or supplement the contractual terms." *Id.* at 698. Boling asks the court to use extrinsic evidence to read the term "non-expiring" into Section 2.3(b) of the Separation Agreement. Spireon contends that this purportedly "contextual" interpretation fundamentally changes the meaning of Section 2.3(b) of the Separation Agreement and directly contravenes Section 3.3, which requires Boling to make himself available to provide additional work at an hourly rate but clarifies that any such work will not be considered as providing services for purposes of the Plan.

Similarly, Spireon argues that Boling's intended use of extrinsic evidence – to add the phrase "non-expiring" – would contradict the plain and unambiguous text of the Plan. Section 8 is simply entitled "distributions" without any limitation. It is directed to "any Participant." The section begins with "[n]otwithstanding anything to the contrary herein," suggesting that it controls over any contradictory provisions. Thus, Spireon asserts that Section 8(c) applies broadly to every participant and every distribution, including Boling. It provides a five-year limitation for all distributions to all participants and does not contain an exception for Boling. Section 11 of the Plan sets forth Boling's "Non-Dilutable Conversion Right" and Paragraph 2.3(b) of the Separation Agreement discusses Boling's "non-dilutable interest," but neither makes mention of a "non-expiring" interest.

In Tennessee, a court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). Courts are instructed to look to three sources to seek this intention: "the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract." *Individual Healthcare Specialists*, 566 S.W.3d at 692 (quoting *Hughes v. New Life Development Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012)).

"Tennessee Courts 'give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute.'" 566 S.W.3d at 694. Our courts have firmly rejected "any notion that courts are a fallback mechanism for parties to use to 'make a new contract' if their written contract purportedly fails to serve their 'true' intentions." *Id.*

"[A] court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The "central tenet of contract construction" holds that the parties' intent at the time of executing the agreement should govern which is "presumed to be that specifically expressed in the body of the contract." *Id.* When resolving disputes of contract interpretation, a court should determine the intentions of the parties based upon the usual, natural, and ordinary meaning of the contractual language. *Id.* at 889-890. Contractual language is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 792 (Tenn. Ct. App. 2009) (internal citations omitted). A contract is not ambiguous,

however, "simply because the parties have different interpretations of its provisions." *Id.* (internal citations omitted). Importantly, "[d]etermining whether a contractual provision is ambiguous is a question of law." *Id.* (internal citations omitted). If the terms of the contract are clear and unambiguous, "the literal meaning of the language controls the outcome of the contract disputes." *Planters Gin Co.*, 78 S.W.3d at 890.

According to Boling, the parties all placed the same interpretation on his rights and the effect of his surrender and conversion that Spireon now tries to dispute. He claims Spireon's change in position arose only 45 days prior to closing the sale to Greenbriar Capital. He contends that Spireon's internal records show that it treated Boling's non-dilutable interest as non-expiring prior to the sale. Specifically, per Boling, certain spreadsheets treated his interest as non-expiring. He notes that the spreadsheets were arranged in three subcategories of employees: (1) Active Employees, (2) Terminated Employees, and (3) a special subcategory for Boling. He asserts that there would be no reason for Spireon to create a third category for him if he was to be treated exactly the same as all other former employees because the same rules would apply to both categories. Boling argues that by separating him out, Spireon confirmed the interpretation that Boling's non-dilutable interest differs from those of terminated employees. Also, he notes that Spireon added a unique note to his row, explaining that his interests were "fixed grants." He additionally points out that his row does not include an entry for a termination date that would be used to calculate expiration of interest.

Spireon asserts that the blanks in the spreadsheets do not actually show that it treated Boling's interest as expiring or non-expiring. Rather, they are simply blanks. Spireon observes that the spreadsheets contain a blank for Boling's termination date despite no one disputing that he was terminated, and even Boling acknowledges that Boling's employment ended in 2013. According to Spireon, the spreadsheets were a matter of accounting, not of contractual interpretation. The blank cells were not a manifestation of an understanding of non-expiration; they simply reflect a lack of detailed recordkeeping or inquiry when no merger was imminent. When the Liquidity Event arose, it became necessary for Rita Parvaneh (Spireon's CFO), to confirm all interests in the Plan.

The Plan plainly set forth the five-year expiration period applicable to all Plan participants. The phrase "notwithstanding anything to the contrary herein" has a plain and clear meaning. By its plain terms, Section 8(c) applies to Boling.

The Separation Agreement is the last written document between the parties and provides the full and final settlement of Boling's compensation from Spireon. The Separation Agreement became effective October 1, 2013, over two and half years after the Plan was implemented. Boling expressly acknowledged that he read, understood, and had the opportunity to consult with counsel prior to signing the Separation Agreement in 2013. As of the effective date of the Separation Agreement, Boling ceased participating in all Spireon benefits plans, and from that point forward, any rights Boling had in Spireon's

benefits plans would "be determined in accordance with, and governed by, the respective terms of such plans *and this [Separation] Agreement.*"  (Emphasis added.).

As the Plan "is clear and unambiguous, the literal meaning of the contract controls the dispute." *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014).  As noted by Spireon, if the parties who structured the Plan intended for Boling's shares to be forever lasting, they could have said so.  Instead, Paragraph 11 is silent on expiration dates, while Paragraph 8(c) is clear on the prohibition to distributions to <u>any</u> participant five years after termination, even going so far as to clarify that this expiration applies "[n]otwithstanding anything to the contrary[.]"  For the reasons above, we affirm the ruling of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this cause is remanded to the trial court for collection of the costs below.  The costs on appeal are assessed against the appellant, Brian Boling.

_____
JOHN W. MCCLARTY, JUDGE